## NATIONAL CITY BANK OF NEW YORK v. HELVERING, Commissioner of Internal Revenue.

### No. 188.

Circuit Court of Appeals, Second Circuit.

July 12, 1938.

Frederick H. Wood, of New York City, and P. P. Campbell and H. B. McCawley, both of Washington, D. C. (Joseph C. White and Charles McClumpha, both of New York City, of counsel), for petitioner.

James W. Morris, Asst. Atty. Gen., and Sewall Key, Carlton Fox, and Lee A. Jackson, Sp. Assts. to Atty. Gen., for respondent.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

94

L. HAND, Circuit Judge.

This case arises on a petition to review an order of the Board of Tax Appeals, assessing an income tax deficiency for each of the years 1922 and 1923 against the petitioner, as executor of James E. O'Neil. The facts are as follows. During the years 1921, 1922 and 1923 O'Neil was president and general manager of the Prairie Oil and Gas Company. He resigned on September 11, 1923, left for France in December of that year, and so far as the record shows, did not return until some time during the year 1928; he died on August 21, 1931, a resident of the city of New York. In 1921 two Texas oil companies, controlled by one, Humphreys, owned large oil fields which Humphreys wished to exploit. O'Neil, one Blackmer, and Stewart, president of the Standard Oil Company of Indiana, went over these fields, and about the middle of November, Blackmer brought in Sinclair, president of the Sinclair Refining Co., whom he told that he had already arranged to buy 30,000,000 barrels of oil from Humphreys. On the 16th and 17th, O'Neil, Stewart, Sinclair, Blackmer and Humphreys agreed upon a price of $1.75 to the Prairie, Sinclair and Standard Oil Companies; and Blackmer and Humphreys agreed privately upon a price of $1.50 a barrel between themselves. Blackmer told the other three that their companies must buy from the Continental Trading Co., Ltd., a Canadian company, organized on the 16th by a Toronto barrister, named Osler. They agreed: one contract was made by which Humphreys' companies were to sell 33,000,000 barrels to the Continental Co. at $1.50 a barrel; another, by which the Continental Co. was to sell to the Prairie and Sinclair companies the same oil at $1.75. (The Standard Oil Co. shared in this contract with the Sinclair Co.) These contracts were later ratified by the Standard Oil Co., the Prairie Co. and the Sinclair Co., all of which knew of the difference in price between the two contracts. Apparently at about the same time Sinclair told Blackmer that he would expect some part of that difference for himself, and on the 26th, Osler told Stewart that he also might have a share. Stewart thereupon executed a declaration of trust to his company of any interest that he might receive; informed one of its officers, and put the instrument in his safe deposit box. It does not appear when O'Neil decided to take a part, but he must have done so, for he, Blackmer, Sinclair and Stewart divided the difference between themselves in substantially equal proportions, and all kept any knowledge of it from their companies, except as we have just stated as to Stewart. A pipe line was laid and the oil began to run in January of 1922; large profits resulted, amounting during the year 1922 and up to June, 1923 to over three million dollars. As the money came in, Osler bought Liberty Bonds with it which he distributed among the four: $727,000 each to O'Neil and Blackmer; $759,500 to Stewart; and $750,000 to Sinclair. (O'Neil received $441,000 in 1922 and $286,000 in 1923, the last delivery was probably on June 15th). It does not definitely appear what O'Neil did with his bonds until the end of 1923; except that he clipped all the coupons for 1922 and 1923; and in August, 1922 and June, 1923 cashed them on at least $162,000 of the bonds and deposited the proceeds in his bank. He apparently mixed them with a number of other bonds and may never have reduced the entire batch below those which he received; all we know is that he used at least $31,000 of those coming from the Continental Company for his own purposes in 1924.

A committee of the Senate began to investigate the whole transaction in May of 1923: this apparently frightened those in control of the Continental Co., for on May 26th they sold the contract to the Prairie and Sinclair companies for $400,000, although only one third of the oil had at the time been delivered and the sum was totally inadequate. Shortly before O'Neil left for France in December, 1923, he delivered to his son three or four packages of bonds telling him that among them were $727,000, the property of the Prairie Co., which his son was to deliver to it in case of his death, or during his life upon his written order. In May, 1925, while in Canada, he had an interview with his former secretary, Kountz, and Fitzpatrick, the chairman of the Prairie Company's board of directors, and its attorney, Flannelly. He told them of the bonds and that he had always intended to keep them apart and give them to the Prairie Co.; that he had never returned them as part of his income, and had clipped the coupons by mistake. He gave no explanation of his failure to inform the company earlier, except that there were other persons con-

cerned who might be injured by the disclosure. Thereupon he gave Kountz an order upon his son for $800,000 in Liberty bonds, adding $73,000 for the coupons he had disposed of, and on this order the son delivered that number to the Prairie company.

O'Neil filed income tax returns on June 8th, 1923, and on June 9, 1924; neither one included the bonds, nor did Stewart, Blackmer and Sinclair include theirs in their returns. However, on February 23, 1928, Blackmer's attorney told the taxing officials of those which Blackmer had received, and the Commissioner thereupon assessed him; and on August 26, 1929 posted a letter to O'Neil proposing to assess him also. The deficiency notice was sent to his executor on July 11, 1934.

■ The taxpayer raises three objections: (1) that O'Neil never regarded the bonds as his own, but held them always as agent or trustee for his company; (2) that even though he had taken and held them as his own, they were not his property; and as constructive trustee he could not be taxed upon them; (3) that assuming that he could be taxed, he did not so understand it, and therefore did not file fraudulent returns within the meaning of the statute. As to the first point, if O'Neil always meant to hold the bonds as agent for his company, he went about it in a curiously indirect and covert way, for there was no apparent reason why he should not have turned them over at once. Stewart did mean to take them only as trustee, and he at once divested himself of any interest in them, while continuing to protect the others concerned. Why could not O'Neil have done the same thing? It was not even necessary to inform another officer of his company; an effective trust could have been set up through a third person who would have kept his confidence. The transaction on its face had every earmark of the usual illicit bonus or commission, and there is not a shred of evidence that he ever intended anything else until December, 1923: if there had been, it would be hard to reconcile it with clipping the coupons and depositing more than a fifth of them to his own account. The declaration and delivery to his son in December, 1923, had no legal effect, and nobody suggests that it had; it is put forward as evidence of the intent with which he had originally received the bonds, like the eventual restitution in May, 1925. There

is however no reason so to construe it. In the first place it was altogether inadequate as restitution; he parted with no control, at most it was an expression of pious desire to be realized in the future. But even if it were more, it could hardly throw any light upon the intent with which he had received the bonds of 1922, because there was another adequate, and very different, motive for it. When the Senate committee began to unearth the affair in May, 1923, as we have said, all those concerned at once took fright and cancelled the arrangement. Although the companies did not know till later of the distribution of the profits, they might find out and prudence dictated at least a gesture, looking towards restitution. We also think that the declaration ought not to relate back to O'Neil's intent when he received the bonds of May and June 1923. If it did, why was it so long delayed? Although we do not know why he resigned in September and left for France in December for a four year's absence, and while perhaps we may not connect these events with the progress of the investigation, it would be at least gratuitous to assume that the declaration was in fact not actuated in any degree at all by disclosures made after June. It appears to us that the Board was amply justified in finding that he took all the bonds as his own.

■ It is another matter whether even so they were part of his taxable income. They were of course the property of the Prairie company in the sense that it could have reclaimed them: they were not therefore like the earnings of an illicit liquor seller, which belong to him, however acquired. United States v. Sullivan, 274 U. S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, 51 A. L.R. 1020; Steinberg v. United States, 2 Cir., 14 F.2d 564. But there are several cases in which persons have been taxed upon property which could be recovered from them. For example, the lender upon usurious interest—if on an accrual basis —must include his apparent profit in his return, though possibly he may be allowed to deduct it as a loss if the borrower reclaims it. Barker v. Magruder, 68 App. D.C. 211, 95 F.2d 122. Again, when a railroad collects too large fares, the excess is income, though the passengers have a theoretical right of restitution. Chicago R. I. & P. R. Co. v. Commissioner, 7 Cir., 47 F.2d 990. In Board v. Commissioner, 6 Cir., 51 F.2d 73, 75, an unlawful bonus

obtained by a director at his company's expense was held to be income; and, although the taxpayer seeks to distinguish the decision because the company knew of the arrangement, that did not make it lawful. There are indeed decisions to the contrary. Commissioner v. Turney, 5 Cir., 82 F.2d 661, is one, but it was by a divided court. Our own decision in Rau v. United States, 2 Cir., 260 F. 131, is another, which United States v. Commerford, 2 Cir., 64 F.2d 28, cannot be said to overrule. But in Rau v. United States, supra, the result did not turn on that point alone, and it probably did not receive the attention it otherwise would have had. At any rate we are disposed to overrule it, because, although the decisions are not, as we have shown, entirely harmonious, the weight of authority is against it, and it seems to us wrong in principle. Although taxes are public duties attached to the ownership of property, the state should be able to exact their performance without being compelled to take sides in private controversies. Possession is in general prima facie evidence of ownership, and is perhaps indeed the source of the concept itself, though the time is long past when it was synonymous with it. It would be intolerable that the tax must be assessed against both the putative tortfeasor and the claimant; collection of the revenue cannot be delayed, nor should the Treasury be compelled to decide when a possessor's claims are without legal warrant. If he holds with claim of right, he should be taxable as an owner, regardless of any infirmity of his title; no other doctrine is practically possible, and no injustice, can result. We think therefore that O'Neil was taxable upon the bonds for the years 1922 and 1923.

 Whether he fraudulently omitted them from his returns on June 8, 1923 and June 9, 1924, is a more difficult question. It is not enough that he was defrauding his principal, or knew that he was; he must have meant also to defraud the Treasury. True, he knew that in one way or another he was doing just that, because the bonds were somebody's income, and nobody was paying a tax upon them; but it does not follow, because he was suppressing them so that the Prairie company could not declare them,—though that may be an actionable wrong—that his return was fraudulent and made with an intent to evade his own tax. We shall assume arguendo, that the statute requires that intent. All things are possible and it may be that even while O'Neil held the bonds meaning to keep them, he thought that he was not taxable; but that is too extreme a conjecture to be seriously entertained. So far, therefore, as concerns his return on June 8, 1923, made at a time when he had not shown the least disposition towards restitution and while he was still busy taking bonds and holding them surreptitiously, the case is clear. The return of June 9, 1924 stands on a different footing, and if his declaration of December, 1923, and his subsequent conduct had been less equivocal, our doubts might prevail. On the whole we think that there was enough to justify the conclusion that he understood that he should have charged these as well against himself. We have already said that we believed that when he took his allotments in May and June, 1923, he meant to keep them for himself, and we have just held that as to such bonds it was absurd to suppose that he thought himself not taxable. Therefore, we have only to consider how far he might have supposed that the transaction with his son changed the situation. He is dead, and if he were alive, his testimony would not be conclusive; we cannot *know* what he thought, but we do know what he did in the year before; we know that his declaration in fact related only to the future; and we know that in the spring of the year 1924 he was continuing to treat these bonds as his own. Although fraud must be well proved, the taxpayer has the burden of showing that the Commissioner was wrong and that the Board had no basis for its finding. When the situation as a whole is reconstructed, so far as the evidence allows, it appears to us that there is rational ground for saying that he knew that his return of 1924 should contain the bonds of 1923, just as the earlier return should have. And, indeed, although we recognize that the issues are different, we are not disposed to scrutinize with too jealous an eye whether he thought a fraud on the Treasury in which he was certainly engaged, would inure to his own advantage, or to that of a principal which he had so recently shown himself ready to despoil.

Order affirmed.