**PENN et al. v. ROBERTSON, Collector of Internal Revenue.**

No. 4611.

Circuit Court of Appeals, Fourth Circuit.

Oct. 7, 1940.

---

L. P. McLendon, of Greensboro, N. C.
(A. L. Brooks, of Greensboro, N. C., Paul
P. Cohen, of Niagara Falls, N. Y., and
Norman Block, of Greensboro, N. C., on
the brief), for appellants and cross-appel-
lees.

Joseph M. Jones, Sp. Asst. to Atty. Gen.
(Samuel O. Clark, Jr., Asst. Atty. Gen.,
Sewall Key, Sp. Asst. to Atty. Gen., and
Carlisle W. Higgins, U. S. Atty., and Bryce
R. Holt, Asst. U. S. Atty., both of Greens-
boro, N. C., on the brief), for appellee and
cross-appellant.

Before PARKER and DOBIE, Circuit
Judges, and CHESNUT, District Judge.

CHESNUT, District Judge.

The Commissioner of Internal Revenue
made deficiency assessments for individual
income taxes against the estate of Charles
A. Penn of North Carolina in the amount
of $12,369.50, plus interest for the calendar
year 1930; and in the amount of $83,641.42,
plus interest for the calendar year 1931
to October 22, when Charles A. Penn died.
The executors of the estate paid these
taxes, duly but unsuccessfully petitioned
for a refund, and thereafter filed ·suit .to
recover them from the Collector in the
Middle District of North Carolina. The
district judge, sitting without a jury, found
for the Collector with respect to the 1930
tax, except for a minor item; but found
for the plaintiff with respect to the 1931
taxes; and entered judgment for the tax-
payers in the amount of $93,226.06, with
interest. Both parties have appealed.

A minor part of the tax controversy relat-
ed to deductions from income made by the
taxpayer in the amount of $14,725 for the
year 1930, and $12,271 for 1931, for travel
and entertainment expenses. The district
judge determined that these items were
properly allowable as deductions for the
respective years, and the Collector does not
now further question them. The matter
still in controversy is whether the taxpayer
received any taxable income as the result
of a transaction entered into between him
and the American Tobacco Company, a
New Jersey corporation, with respect to the
allotment or purchase of 10,000 shares of
stock of the Company, initiated in 1929 but
rescinded by the mutual agreement of the
parties in 1931 on the basis of no profit or
loss to either party. The circumstances of
this transaction will now be stated in more
detail.

The American Tobacco Company is a
large and financially successful corpora-
tion having a national and international
business in the manufacture and sale of
cigarettes and other forms of tobacco. For
many years prior to 1929, Charles A. Penn
had been and until his death continued
to be an active vice-president and director
of the Company, principally in charge of
production. For some years before his
death he received a very large fixed salary
and in addition, under a by-law of the
Company applicable to himself and other
officers, a contingent interest in the net
profits of the business. His aggregate
salary, fixed and contingent, from the
Company and its subsidiary, amounted to
$372,654.29 for 1930 and $587,171.29 for
1931. With other officers and employes he
had participated prior to 1929 in an "em-
ployes' stock benefit fund" originally cre-
ated by the directors of the Company in
1914. The nature and operation of this
fund is not here important except to note
that Penn was in receipt of large pecuniary
benefits therefrom. This fund had been
originally created and continued by the di-
rectors with amendments apparently without
authority from the stockholders, although
by Chapter 175 of the New Jersey Laws
of 1920, N.J.S.A. 14:9–1 et seq., it was
provided that a plan for the participation
of employes in the purchase of stock or in
the profits of the corporation must be first
formulated by the directors and approved

by two-thirds of each class of stockholders represented and voting thereon.[1]

On October 16, 1929, the directors of the Company passed a resolution for the allotment or sale of a further amount of stock of the Company to officers and employes. This was known as the stock allotment plan of 1929 which is involved in the present controversy. By the resolution, the president of the Company was authorized to allot 60,000 shares of the common stock of the Company among "valued employees" on the basis of selling the stock to the allottees at the previous cost price thereof to the Company. This cost price was then estimated to average not more than $175 per share, while the then market price of the stock was $222 per share. The allotment was to be made by the president "to such officers and * * * such employes and upon such terms as may in his opinion be deemed to the best interest of the Company in promoting and encouraging greater efficiency, more harmonious and enthusiastic cooperation and greater endeavors toward the welfare of the Company". Pursuant to this resolution the president of the Company immediately allotted 51,750 shares of the stock, of which 5,250 shares were allotted to employes who were not directors, 7,250 shares to directors who were not present at the meeting, and 37,250 shares to the directors present at the meeting, including about 15,000 shares allotted by the president to himself. The market price for the stock so allotted to the directors present at the meeting (the president not voting) was nearly two million dollars greater than the allotment price. This employes' stock allotment plan was never submitted to the stockholders for their approval.

Under the plan the president allotted 10,000 shares of the stock to Charles A. Penn. The transaction was put in the following form: Penn signed a demand note to the treasurer of the Company for $1,722,500 with 6% interest, and deposited the certificates for the stock in his name endorsed in blank with the treasurer as collateral. The note provided that upon Penn's death or termination of official relations to the Company it should mature. In a contemporaneous letter from the president to Penn, the latter was advised that he would be charged with interest on the note at a fair rate to be decided by the treasurer, and the dividends on the stock would be credited to the note. Penn was at liberty to pay the amount due on the note and take up the stock, but he was further advised by the letter that so long as he allowed the stock to remain with the treasurer the note would be further credited with "the amount proportionately accruing to you from the employes' stock purchase fund" above referred to; and if the stock was withdrawn, Penn's participation in the fund would cease at the end of the calendar year preceding the withdrawal. It further appeared from testimony in the case that it was the definite understanding of all the allottees of the stock that their notes given for the purchase price would in due course of time be fully paid from the credits on the note arising from dividends on the stock and benefits accruing from the employes' stock purchase fund; and further

---

[1] Chapter 175, New Jersey Laws 1920, provides:

"1: Any stock corporation * * * may, upon such terms and conditions as may be determined in the manner hereinafter designated, provide and carry out a plan or plans for any or all of the following purposes: (a) The issue or the purchase and sale of its capital stock to any or all of its employees and those actively engaged in the conduct of its business or to trustees on their behalf, and the payment for such stock in installments or at one time with or without the right to vote thereon pending payment thereof in full, and for aiding any such employees and said other persons in paying for such stock by contributions, compensation for services, or otherwise. * * *

"2. Any of the privileges and powers hereinbefore granted may be exercised in the following manner: (a) By including appropriate clauses therefor in the original articles of incorporation or by-laws at the time of organizing the corporation. (b) Where the corporation has been formed without the said charter or by-law provisions the board of directors shall first formulate such plan or plans and pass a resolution declaring that in its opinion the adoption thereof is advisable, and shall call a meeting of the stockholders to take action thereon. The stockholders' meeting shall be held upon such notice as the by-laws provide, and in the absence of such provision upon ten days' notice given personally or by mail. If two-thirds in interest of each class of stockholders present at said meeting and voting shall vote in favor of any such plan or any modification thereof, the said plan shall thereupon become operative."

that a sale of the stock by an allottee would doubtless result in his prompt dismissal as an employe of the Company.

In June 1930 the directors of the Company proposed another and further stock subscription plan for officers and employes which was submitted to and approved by the requisite vote of the stockholders on June 28, 1930. Under this on January 28, 1931, the directors authorized a sale of 56,712 shares of stock of the par value of $25 per share, the market price thereof then being $112. "Of this number 32,370, more than half, were allotted to the directors, of which 13,440 were allotted to the president. The remaining 24,342 shares were allotted in relatively small amounts to 525 employees".[2]

On February 16, 1931, Richard Reid Rogers, a stockholder of the Tobacco Company, filed a suit in a New York State Court which attacked the validity of the 1930 plan; and on February 20, 1931, he instituted in the same court a second suit with the same objective in which Penn was named as a party defendant. In consequence of these suits the directors of the Company deemed it advisable to modify the form of the 1929 plan by substituting the Guaranty Trust Company of New York in place of the treasurer of the company as payee of the stock purchase notes given by Penn and others under the 1929 plan. Pursuant thereto Penn signed a new demand note to the Guaranty Trust Company dated March 30, 1931, in the amount of $1,377,025.58 with interest at 4% secured by the stock as collateral; but it was understood that the prior arrangement between Penn and the Company with respect to credits on the note should continue. When this transfer of the note was made the treasurer of the Company for "accounting convenience" calculated the amount due from Penn on the note as of December 31, 1930, and adjusted the dividend credit and interest charge to March 30, 1931, and paid to Penn by check the difference in his favor in the amount of $31,498.14.

After March 30, 1931, additional actions were instituted by Rogers attacking the validity of other bonus and stock purchase plans of the Company. Six suits in all were instituted by him. One of these filed October 23, 1931, against the Tobacco Company and its president directly attacked the 1929 plan and demanded that the president account for benefits received by him thereunder. Two of these suits were removed to the Federal Court in New York and subsequently were considered by the Supreme Court on certiorari, resulting in a direction to the District Court to decline jurisdiction in the suits without prejudice to their reinstitution in the courts of New Jersey. Rogers v. Guaranty Trust Co., 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720. See also the same cases in the District Court and in the Circuit Court of Appeals for the Second Circuit; 60 F.2d 106 and 60 F.2d 114; and the related cases in Rogers v. Hill, 53 F.2d 395, and Id., 60 F. 2d 109.

As a result of the pendency of this litigation and before any decision in the cases, the directors of the Tobacco Company, on the advice of counsel, decided that it would be advisable to abandon the 1929 plan, and on December 15, 1931, passed a resolution "that the said allotment of stock and all credits applicable thereto be and the same are hereby rescinded and cancelled as to all participants that may agree thereto * * * upon reimbursement to such participant or his legal representative of the net cost to said participant of said stock, and that thereupon all credits and rights of such participant under said 1929 stock plan be and be deemed cancelled and at an end". Penn had previously died on October 22, 1931, but the record shows that he was advised of the litigation and appreciated the possible or probable infirmity of his right to the stock and was willing to surrender it. After his death and pursuant to the resolution of the directors for the rescission of the transaction, his executors, on the advice of counsel, agreed to the rescission. The Tobacco Company settled with the Guaranty Trust Company and took back the stock and the executors refunded to the Tobacco Company the $31,498.14 which Penn had received in the previous March. The whole transaction was thus consummated within the calendar year 1931 on the basis of no profit and no loss to either Penn or the Tobacco Company. In the estate tax return filed by Penn's executors the stock was not included but the Collector was advised of the nature of the transaction. The Commissioner determined that the stock was not an asset of the estate. The market value of the stock on the date of the decedent's death was $1,798,562.50; the

[2] See Rogers v. Guaranty Trust Co., 288 U.S. 123, 134, 53 S.Ct. 295, 299, 77 L.Ed. 652, 89 A.L.R. 720.

amount then still due on the note amounted to $1,347,631.48. The equity in Penn's favor at current market price was then $451,931.02. It may also be noted that in subsequent income tax accounting the Tobacco Company claimed deductions for the amounts credited to Penn on the note ·which, however, were disallowed by the Commissioner and his ruling was acquiesced in by the Company.

Prior to the rescission of the 1929 plan, Penn was credited on his note in the amount of $125,000 representing dividends on the stock in the year 1930 and ·with $95,000 as dividends in 1931. He was also credited with proportional sums under the employes' stock benefit fund above referred to in the amount of $90,702.80 for the year 1929, and in the amount of $181,-708.12 for the year 1930. While these latter amounts were the result of earnings of the fund for 1929 and 1930 respectively, the exact amounts could not be ascertained by reason of the widespread business of the Company until two or three months after the close of the calendar year. Therefore the amount of $90,702.80 earned for 1929 was not ascertained and credited until some time in 1930, although when actually made the bookkeeping entry was as of December 31, 1929. And similarly the credit of $181,708.12 was not made until about March 1931.

In determining the income tax deficiency against Penn for the year 1930, the Commissioner included the dividends of $125,-000 credited on the note to Penn in that year, and for the year 1931 the Commissioner included the dividends credited in that year in the amount of $95,000, and also the credits from Penn's participation in the employes' stock benefit fund for both years in the whole amount of $272,410.92. The theory of the Commissioner in charging the whole of the latter sum for 1931 was apparently based on the view that the 1929 stock plan was an employes' trust under section 165 of the Income Tax Act of 1928,[3] 26 U.S.C.A.Int.Rev. Acts, page 407, which was terminated by the transfer of the note from the treasurer of the Tobacco Company to the Guaranty Trust Company.

The questions of income tax law that emerge from these related facts are whether Penn received any taxable income in 1930 or 1931 or in both years by virtue of this stock transaction of 1929. The District Judge in his opinion (29 F.Supp. 386) concluded that Penn did receive in 1930 taxable income of $125,000 from the dividends credited in that year, and also by the credit of $90,700.80 from the stock fund earned in 1929, but not ascertained and credited until 1930; but he also held that Penn was not taxable for the credits either for dividends of $95,000 or stock fund participation of $181,708.12, earned for the year 1930 but credited in 1931, by reason of the rescission of the plan during the calendar year 1931, although after the decedent's death prior thereto on October 22d. As to the income for the year 1930 he adopted the view that Penn constructively received the income under claim of right and was therefore taxable thereon regardless of any infirmity of his title thereto; but as to the 1931 credits he concluded that the rescission extinguished what otherwise would have been taxable income for that year.

The Government's present contention is (1) that all the credits on Penn's note, both for dividends and share of profits, were taxable income in the years in which they were respectively credited because received by him under a claim of right and without restriction as to their disposition, and (2) as to the year 1931, the rescission of the transaction voluntarily made by Penn's executors after his death, although in 1931, could not properly affect Penn's individual income taxability. On the other hand the taxpayer's contention is that (with the exception of the 1931 item of $31,498.14) Penn never actually received any money or benefit from the credits, and is not chargeable with their constructive

---

[3] "Sec. [§] 165. *Employees' Trusts.*

"A trust created by an employer as a part of a stock bonus, pension, or profit-sharing plan for the exclusive benefit of some or all of his employees, to which contributions are made by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, shall not be taxable under section 161, but the amount contributed to such fund by the employer and all earnings of such fund shall be taxed to the distributee in the year in which distributed or made available to him. Such distributees shall for the purpose of the normal tax be allowed as credits against net income such part of the amount so distributed or made available as represents the items of dividends and interest specified in section 25(a) and (b)."

receipt, in view of the invalid and executory nature of the transaction; and as the cash item of $31,498.14 was returned during the calendar year upon the rescission of the plan, it was not taxable as income. Thus two questions are presented for our determination; one, whether the credits on Penn's notes constituted income constructively received by him for both years, and if so, second, whether the rescission in 1931 extinguished what otherwise would have been income to Penn in that year.

At the outset of the discussion it should be noted that the tax controversy exists only because the stock allotment plan was initiated in 1929 and abandoned in a subsequent tax year. If the plan had been terminated during Penn's lifetime in the same tax year that it originated, it is obvious that there would have been no tax, as there was no net profit. On the items in controversy the Commissioner has made tax assessments of about $90,000, which the taxpayers have paid, and the Government contends may not be recovered although the transaction resulted in no net profit. This admitted hardship is said to be necessarily required in this particular case by reason of two propositions of federal income tax law, one that there must be annual returns and settlement of income taxes, and the other that, when a taxpayer dies within a calendar year, the taxable income received by him during his lifetime cannot be affected by any action of his executors after his death even though taken within the same calendar year. The former of these propositions is now old and well established; the latter is new in this case.

■■ There are some principles of income tax accounting applicable to this case now well settled by decisions. In general the income tax law is concerned only with realized gains and losses, Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010; and where, as in this case, the taxpayer's accounts are kept on a cash basis and not on an accrual basis, he receives taxable income only when it actually comes into his possession or, if only constructively received, when the amount is definitely ascertained and subject to his unrestricted control. North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; Lynchburg Trust & Savings Bank v. Commissioner, 4 Cir., 68 F.2d 356, certiorari denied 292 U.S. 640, 54 S.Ct. 773, 78

L.Ed. 1492. But in view of practical necessities, income tax accounting with the Government must be on an annual basis, Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S.Ct. 150, 75 L.Ed. 383; Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337; and, therefore, moneys received by a taxpayer as his own under a claim of right and without restriction as to their disposition are taxable for the year in which they are received and retained even though in a later year the taxpayer is obliged to refund them in whole or in part, in which event he would have a claim for deduction in the later year. Burnet v. Sanford & Brooks Co., supra; Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; Saunders v. Commissioner, 10 Cir., 101 F.2d 407.

■ In support of their contention that the credits on the notes did not constitute income constructively received by Penn, under the circumstances of this case, one of the principal arguments advanced by the taxpayers is that the stock allotment plan of 1929 was wholly invalid and void *ab initio*; while the Collector contends that it was only a sale of stock at a favorable price or at least only a voidable transaction. In the absence of any controlling New Jersey decision, it is our opinion that the transaction was *ultra vires* of the directors and therefore void in the sense that it had no legal force and effect, and was incapable of enforcement without the approval of the stockholders, which was never contemplated or given; rather than merely voidable. 67 C.J. 264, 265. When the 1929 allotment was made to Penn similar allotments were made to other active officers of the Company who were directors voting at the meeting in favor of the 1929 plan. The market price of the 10,000 shares allotted to Penn was $470,000 more than the face of his note, and the aggregate excess of market over allotment price of the shares of stock allotted to the directors was more than $2,000,000. We regard it as clear that the directors had no power or authority to make to themselves what was in effect that large gift from the assets of the Company. Gardner v. Butler, 30 N.J.Eq. 702, 721; 19 C.J.S., corporations, § 805, pp. 199-201. It was an unauthorized distribution of corporate assets made by the directors as fiduciaries to themselves, in disregard of the rights of stockholders and the controlling New Jersey statute. No doubt, as stated in the

174

resolution, the distribution was intended to be in the nature of additional compensation for services to be performed in the future, but even this was not expressly required. Counsel for the Collector argues that the transaction was merely a sale of stock at a favorable price, and, although possibly voidable, not within the scope of the New Jersey statute. We cannot accept this view, as the resolution of the directors, both in the origination of the plan and its later rescission, describe it as "stock allotment plan", entitling the allottees to participate in the profits of the Company in addition to applicable dividends as credits on the purchase price, which itself was greatly below tthe current market price for the stock. The terms of the resolution and the confirmatory testimony very clearly bring the plan within the wording of the New Jersey statute. In Rogers v. Guaranty Trust Co., 288 U.S. 123, 144, 53 S.Ct. 295, 302, 77 L.Ed. 652, 89 A.L.R. 720, while the majority of the Supreme Court dismissed the case on jurisdictional grounds, Mr. Justice Stone, in dissenting said, speaking particularly of the 1930 plan but applicable also to the 1929 plan: "Authority of the directors to bestow gratuities upon themselves in the form of subscription rights must be found in a plan approved in advance as the statute provides, by two-thirds of each class of stock. If no plan was presented to stockholders, as I think was the case, the entire stock issue was ultra vires and cannot be ratified any more than any other unauthorized disposition of corporate assets."

■ But while we regard the plan as void rather than merely voidable, that is not the crucial test as to whether the credits constitute constructively received income. If the transaction had been valid, we take it there would be no doubt that the credits constituted income constructively received, just as interest credited on a savings bank deposit, although not actually withdrawn by the depositor, is taxable income. And if the amounts of the credits, instead of being merely credited on the note, had been actually paid to Penn, as was the cash item of $31,498.14, they would have been income taxable to Penn in 1930, and also in 1931, except as affected by the rescission, despite the illegality of the transaction. This rule has been frequently applied by the courts with respect to income received and retained in a great variety of circumstances where the income

was tainted with illegality. Illustrative cases are—National City Bank of New York v. Helvering, 2 Cir., 98 F.2d 93 (illicit profits to corporate officers); Griffin v. Smith, 7 Cir., 101 F.2d 348; Saunders v. Commissioner, 10 Cir., 101 F.2d 407 (excessive commissions or bonuses to corporate officers); United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, 51 A.L.R. 1020 (bootlegging profits); United States v. Commerford, 2 Cir., 64 F.2d 28; and Chadick v. United States, 5 Cir., 77 F.2d 961 (bribes); Chicago, R. I. & P. Ry. Co. v. Commissioner, 7 Cir., 47 F.2d 990 (excessive tariff charges); Ford v. Commissioner, 6 Cir., 51 F.2d 206 (dividends on stock prematurely distributed); United States v. Wampler, D.C., 5 F.Supp. 796 (moneys misapplied by an attorney to his own use).

Whether the credits constituted constructively received income must be determined under all the circumstances of the case, of which the invalidity of the transaction is only one factor. On behalf of the taxpayers it is argued that, with the exception of the one cash item paid in 1931, the whole plan remained executory until it was finally abandoned, and by virtue of its invalidity, it could never have been legally enforced by Penn if resisted by the Tobacco Company; and that, while Penn had the nominal right to pay the balance due on the note and take up the stock, it was never really contemplated that he would do so until the note was fully paid by accumulated credits; and that if he had taken up the stock either from the Tobacco Company or the Guaranty Trust Company he would have thereafter lost further participation in the large profits from time to time contemplated to be credited to him from earnings of the Company under the stock employes' fund which may, for brevity, be called bonuses. It is also pointed out that with the exception of Barker v. Magruder, 68 App.D.C. 211, 95 F.2d 122 (to be presently further referred to) all the cases in which illegally received income was held taxable involved cases of actual and not constructive receipt of income; and that the doctrine of constructive receipt of income should be sparingly applied. Hines v. Commissioner, 38 B.T.A. 1061, 1067.

■ These considerations have some plausibility and weight in determining the question; but in our opinion there are still weightier factors which support a contrary

conclusion. A cardinal principle of federal income taxation requires annual returns and accounting; and this principle requires the determination of income at the close of the taxable year without regard to the effect of subsequent events. Thus, in determining whether the credits made on the note in 1930 constituted income for that year, it is necessary to disregard the rescission in 1931; and we must determine the question in the light of conditions that existed at the end of 1930. At that time the 1929 stock allotment plan had not been challenged, and, in view of the prior history of the corporation with respect to large salaries and bonuses to its active officers (see the dissenting opinion of Mr. Justice Stone in Rogers v. Guaranty Trust Co., 288 U.S. 123, 133, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720), it is probable that neither Penn nor the directors of the Tobacco Company anticipated any trouble about the matter; and it may be that they were not conscious of any wrongdoing in the transaction. While Penn did not include the 1930 credits on the note in his personal income tax return for 1930, it is probable that his failure to do so resulted from the theory, later adopted by the Commissioner, as to the bonus credited in that year, that the 1929 stock allotment plan was an employes' trust under section 165 of the Revenue Act of 1928. There is no reason to suppose that if Penn had asserted his nominal right to pay the note and take over the stock, there would have been any objection or resistance by the Tobacco Company. In fact when in March 1931, the first of the Rogers suits was filed, the directors reaffirmed the plan and partially executed it, by transferring the loans to the Guaranty Trust Company. Under these circumstances if the amounts credited to Penn on the note in 1930 had been actually paid to him, as was the case of the cash item of $31,498.14 in 1931, it seems clear enough that the amounts would have been received and held by Penn under a claim of right and without restriction as to their use.

Constructively received income is taxable when the amount is definitely liquidated and available to the taxpayer without restriction. The circumstances under which the credits were made met these conditions. The credits were precise in amount and were absolutely made as reductions of the notes. They were not actually received by Penn only because they were applied for his benefit in the reduction of the amount of his obligation on the notes. In this respect the matter is not materially different from ordinary cases where income on collateral of a borrower from a bank is paid to the bank by order of the borrower. The only unusual feature of this case is that it now appears, from developments subsequent to 1930, that the transaction really was invalid and was rescinded in 1931, but these later developments may not properly affect the determination of the income tax for 1930. Barker v. Magruder, supra, considered a similar question. There the taxpayer, a loan company, whose accounts were kept on an accrual basis, had made on its books during the taxable year usurious interest charges against borrowers. The receiver for the company contended that such credits were not taxable because legally unenforceable, but the court in a carefully reasoned opinon by Chief Justice Groner, held to the contrary, taking the view that, as the borrowers had not then challenged the legality of their obligation, the taxability of the items should be determined on the basis of past experience as to their probable collectibility. We conclude that the credits on Penn's note in 1930 were taxable income for that year.

A very different question is presented as to the 1931 income. The cash payment of $31,498.14 to Penn was admittedly prima facie taxable income, and the reasons for holding the credits on the note were also such taxable income, after the loan was transferred to the Guaranty Trust Company, are even stronger than in the case of the 1930 credits. But we agree with the district judge that the rescission in 1931 before the close of the calendar year, extinguished what otherwise would have been taxable income to Penn for that year. The Collector contends that the rescission was not a genuine rescission but really a re-sale of the stock. But this is refuted by the record, the stipulation of counsel and the findings of the district judge. We have no doubt that the parties intended a genuine rescission. Certainly what was done was entirely consistent therewith. The only possible doubt as to whether it was properly called a rescission flows from the intrinsic invalidity of the original transaction; in view of which, the so-called rescission might possibly more properly be called an abandonment of an invalid executory contract with a restora-

tion by Penn's executors of the improperly received cash item of $31,498.14. But in no sense could it properly be termed a re-sale.

■ The more serious contention made by counsel for the Collector on this point is that, although Penn's tax accounting was on the cash basis and for the calendar year, his taxable period ended with his death on October 22d, and what was subsequently done by his executors, even though done in the same calendar year, cannot affect the matter. To support this contention, reliance is placed on the provisions of the income tax law that an individual taxpayer and his estate are separate taxable entities; and it is argued therefrom that nothing can be done by executors to affect income chargeable to their decedent within his lifetime, and therefore the loss to Penn by the rescission or re-sale could only serve as a deduction against income received by his executors after his death during the calendar year. In the instant case the tax assessed by the Commissioner against Penn for 1931 was about $80,000, while the tax payable by the executors for the balance of the calendar year without such deduction was only $108.65. No authority is cited in support of the Commissioner's contention in this respect, and we do not consider it sound. Executors are personal representatives of a decedent (Fox Film Corp. v. Knowles, 261 U.S. 326, 43 S.Ct. 365, 67 L. Ed. 680; 23 C.J. 1170) and have the power to act for him in determining, in accordance with law, what constitutes assets of the estate. It was therefore within their province to rescind this illegal contract and refund the item of $31,498.14 as an asset not properly belonging to the estate. It is also urged that income chargeable to Penn cannot be affected by something done in a subsequent taxing period and that, in view of Penn's death on October 22d, the remainder of the calendar year constituted a separate taxing period. But we think this view is also not tenable. The doctrine of Sanford & Brooks, supra, is based on the necessities of annual income tax accounting in order that there may be some definite periodic determination of the Government's revenues from income taxation, and to prevent extended delays which would occur if continuing transactions were indefinitely held open for the computation of profit and loss. It is not denied that the rigid rule of annual returns does inevitably work some hardship upon taxpayers in particular cases, and this unfortunate although necessary incident of income taxation would be increased if the doctrine were extended as now urged. No statute or decision is called to our attention which requires this extension of the rule, and we are unwilling to make it.

■ The contention for the Collector on this point is based on the erroneous assumption that Penn's tax accounting period ended with his death on October 22, 1931, and was not for the full calendar year. This runs counter to the applicable decisions and regulations. Bankers' Trust Co. v. Bowers, 2 Cir., 295 F. 89, 31 A.L.R. 922; Bliss v. Commissioner, 3 Cir., 76 F. 2d 101, 102, 99 A.L.R. 584; Commissioner v. Riley Stoker Corp., 1 Cir., 67 F.2d 688; Hymel P. & M. Co. v. Commissioner, 5 B. T. A. 910, 914. Consistent therewith Art. 371 of Treasury Regulations 74, promulgated under the Revenue Act of 1928 provides: "Returns for Periods less than 12 months * * * The return of a decedent or of his estate for the year in which he died is a return for 12 months and not a fractional part of a year."

And where a partner dies during a taxable calendar year, his proportionate share of taxable income from partnership profits to the time of his death may be computed by taking into consideration results of partnership transactions after the death of the decedent. Davison, Executor v. Commissioner, 20 B. T. A. 856, affirmed 2 Cir., 54 F.2d 1077; Darcy v. Commissioner, 2 Cir., 66 F.2d 581; First Trust Co. of Omaha v. United States, Ct.Cl., 1 F.Supp. 900, 904.

■ Probably owing to the unusual nature of the case, the taxing officers of the government have not acted on any consistent theory with respect to the taxability of the items in controversy in this case. At first the Commissioner acted on the theory that the 1929 stock allotment plan constituted an employes' trust under section 165 of the Revenue Act of 1928, 45 Stat. 791, but even this theory was not consistently applied because the dividend credit of $125,000 in 1930 was charged to Penn for that year when it apparently should have been charged on the particular theory to 1931. This theory has now been repudiated by counsel for the Collector, and we think rightly so, as held by the district judge. When the executors filed their

estate tax return they did not include the stock allotment as an asset of Penn's estate but made an explanatory statement of the transaction. Thereupon the Commissioner did not include the equity in the stock of nearly half a million dollars in valuing the assets of the estate. It seems logically clear that if the rescission was ineffective as to the income for 1931 it was equally ineffective as to the equity in the stock. And this view was advanced in the district court by counsel for the Collector who claimed a set-off for underpayment of estate taxes in the amount of $47,000. The claim was rejected by the district judge on the authority of McEachern v. Rose, 302 U.S. 56, 58 S.Ct. 84, 82 L.Ed. 46, and it is not now pressed here. The credit on Penn's note for $90,702.80 for proportionate profits earned for 1929 but not actually credited until about March 1930 was included by the Commissioner in Penn's income for 1931, but it is now conceded by counsel for the Collector that it should have been taxed if at all in 1930. We agree with the district judge that this was the correct view, although counsel for the taxpayers contend that it was taxable if at all for 1929 and not 1930, and likewise that the credit in 1931 of $181,708.12 for earnings in 1930 should have been taxed if at all for 1930. As both these items were not ascertained in amount and not credited until 1930 and 1931 respectively they constituted income for the respective years in which they were credited and not for years in which the profits were earned by the Tobacco Company. Avery v. Commissioner, 292 U.S. 210, 54 S.Ct. 674, 78 L.Ed. 1216. As the credit of $90,702.80 was properly taxable as income for 1930 but not so taxed by the Commissioner it results that there was an underpayment by Penn for 1930, despite the deficiency assessment made by the Commissioner for that year. In the trial court, counsel for the Collector contended that the resulting deficiency should be deducted from the overpayment, if any, for 1931 on the authority of Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421, but the trial judge ruled McEachern v. Rose, supra, controlled, as any further 1930 income tax against Penn was barred by limitations. The Collector's contention for this set-off is not now pressed.

The judgment appealed from is affirmed.

PARKER, Circuit Judge.

I concur in the result reached in the foregoing opinion and I concur also in the reasoning of the court, except with respect to grounds upon which the dividends credited in the year 1930 are taxable as income. In my view, the stock transaction was not absolutely void but voidable. See Rogers v. Guaranty Trust Co., 2 Cir., 60 F.2d 114, 118; 67 C.J. 270; Toledo, etc., R. Co. v. Continental Trust Co., 6 Cir. (Lurton, J.), 95 F. 497, 525; Anderson v. Roberts, 18 Johns. 515, 528, 529, 9 Am.Dec. 235. As said in Anderson v. Roberts, supra, "A thing is void * * * where no person is bound by the act; but a thing is voidable which is done by a person who ought not to have done it, but who, nevertheless, cannot avoid it himself, after it is done." If the value of the stock had declined below the price at which Penn purchased it or, if the company had become insolvent, I apprehend that Penn could not have avoided paying for it in accordance with the terms of the note if the company or its receiver had insisted on payment. The case is not one where the issuance of the stock was ultra vires the powers of the corporation, but where the purchase and allotment at an inadequate price of stock lawfully issued was a fraud upon the corporation and was made by its officers without compliance with legal requirements. The law seems well settled that such a transaction is voidable and not void. See 14 C.J. 406, 456; 18 C.J.S., Corporations, §§ 207, 257, pp. 641, 721; 19 C.J.S., Corporations, § 795, p. 176; 13 Am.Jr. 328 and cases there cited. This being true dividends from the stock credited on the note in 1930 represented income from the investment received during that year, notwithstanding that the transaction was rescinded in the year following and the benefit of the dividends was then surrendered along with the stock. If, however, I were of opinion that the stock transaction was absolutely void, ab initio, and not merely voidable I would think that no taxable income resulted from the entry of the credit for dividends on the note of Penn. If the stock transfer was void, the credit of the dividends was likewise void. No taxable income could possibly result from void entries of credit on a void note. Ex nihilo, nihil fit.