Robert G. Fairburn and Margaret T. Fairburn v. Commissioner.
Fairburn v. Commissioner
Docket No. 6166-66.
United States Tax Court
T.C. Memo 1969-77; 1969 Tax Ct. Memo LEXIS 220; 28 T.C.M. (CCH) 438; T.C.M. (RIA) 69077; April 17, 1969, Filed Chester L. Hirsch, 15 William, New York, N. Y., and Alan Prigal, 36 W. 44th, New York, N. Y., for the petitioners. Jay S. Hamelburg and Richard J. Mandell, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income taxes for 1961 and 1962 in the amounts of $21,173.48 and $61,269.20, respectively. The sole issue presented for decision is whether expenses, in the amount of $25,930.10 in 1961 and $74,873.56 in 1962, incurred by petitioner in connection with the operation of his personally-owned airplane, are deductible under section 162[1] or section 212, or are nondeductible personal expenses under section 262. Findings of Fact Robert G. Fairburn (hereinafter referred to as petitioner) and his wife, Margaret T. Fairburn, had their legal residence in Mendham, *222 New Jersey, at the time of the filing of their petition. They filed joint income tax returns for 1961 and 1962 with the district director of internal revenue, Newark, New Jersey. Petitioner was a trustee and the sole income beneficiary of a trust, created on December 31, 1931. The trust held as its only investment asset 50 percent of the stock of The William Gordon Corporation (hereinafter family corporation); during 1961 and 1962, the remaining 50 percent of the stock was held by a similar trust for the benefit of petitioner's brother. The family corporation was a holding company, and at all times pertinent hereto, petitioner was its president and determined its investment and dividend policies. From 1932 until the autumn of 1960, the family corporation held a large block of stock in Diamond International Corporation (hereinafter Diamond). [2] During this period petitioner was an executive of Diamond; he had become a director of Diamond in 1942, its president and chief executive officer in 1947, and chairman of its board of directors in 1959. In September 1960 petitioner was receiving compensation from Diamond at the rate of $100,000 per annum. *223 An important aspect of the operations of Diamond during petitioner's tenure as chief executive officer was the manufacture of molded paper pulp products. Keyes Fibre Company (hereinafter Keyes), a publicly owned corporation whose shares were traded over the counter, had been a founder of the molded paper pulp products business in 1903. While with Diamond, petitioner occasionally had conferred with Keyes on problems affecting the industry generally and had become acquainted with Albert T. Armitage (hereinafter Armitage), a Boston investment banker who, directly or through his firm, controlled a large block of Keyes stock and was chairman of Keyes' executive committee. 439 In September 1960 petitioner resigned from his positions at Diamond, and shortly thereafter the family corporation sold its Diamond stock for a sum in excess of $7,000,000. Petitioner thereupon was confronted by the necessity of obtaining new executive employment - he was 49 years of age at that time and intended to continue his career in executive management - and a new investment outlet. He contacted Armitage and suggested the possibility of his employment by Keyes and the family corporation's investing *224 in Keyes; petitioner also presented his ideas with respect to change in Keyes' management and operations. Armitage agreed to cooperate with him in effectuating these proposals. Between October 19, 1960, and January 12, 1961, the family corporation purchased 175,375 shares of Keyes common stock and $2,000,000 principal amount of Keyes convertible debentures with warrants, at an aggregate cost of $7,161,010.90. The family corporation owned 11.6 percent and 11.3 percent of the common stock of Keyes on December 31, 1961, and December 31, 1962, respectively, and between 10.8 and 11.1 percent during the years 1963-1966. By virtue of the family corporation's holdings of Keyes stock during the years in issue, petitioner controlled more shares of Keyes than all the other directors and officers of Keyes combined. Petitioner became a member of Keyes' board of directors in January 1961. He was employed by Keyes as a consultant, at a fee of $5,000 per month, from May 1, 1961, to August 31, 1961. During this period he studied the operations of Keyes and acquired the background necessary for assuming the responsibilities of its chief executive officer and chairman of the board, which positions *225 he attained on September 1, 1961, and has since held continuously. Petitioner received the following compensation (exclusive of deferred compensation) [3] from Keyes during the years 1961 through 1966: Year
Salary
Director'sFees
Total
1961
* $36,666.67
$2,300.00
$38,966.67
1962
50,000.04
1,100.00
51,100.04
1963
50,000.04
1,100.00
51,100.04
1964
55,000.00
800.00
55,800.00
1965
50,000.00
800.00
50,800.00
1966
50,000.00
800.00
50,800.00
Keyes' principal and sales offices and main plant were located in Waterville, Maine. It also had a plant in Hammond, Indiana, a pulp mill in Shawmut, Maine, and a regional sales office, with a dozen employees, in New York City, and, during 1961 and 1962, was constructing facilities in Sacramento, California. Petitioner felt that Keyes was a technologically oriented company that needed drastic changes in its sales and marketing procedures. In his opinion, Keyes had to expose itself to the users of its products so that it could "convert [its *226 technology] into the sale of products on a national basis successfully" and take advantage of the international market (which Keyes had neglected). It was also petitioner's opinion that Keyes needed more "convenient access to the market," and that the principal executive office and the sales and marketing activity should be moved to "the New York area or some area closer to the channels of commerce than Waterville, Maine." In May 1961, petitioner moved into Keyes' New York office and established that office as his base of operations, gradually moving many of Keyes' executive and market development functions to it. However, during 1961 and 1962 all of the other officers of Keyes resided in Maine, and even by 1966 a majority of the corporate officers still resided in, and operated from, Maine. The corporate books and records also remained in Waterville, and advertising materials continued to show Maine as the company's location. Petitioner believed that in order to effectively implement his plans to revise the operations and policies of Keyes, he would need to do a substantial amount of traveling, and that the most efficient way of accomplishing this objective was by airplane. During *227 1961 and 1962, it was the policy of Keyes to reimburse its employees for traveling expenses on commercial airlines and, under certain circumstances, on chartered flights. As the chief executive of Diamond, he had often flown on corporate business, mostly in Diamond's private airplane, although occasionally he had used commercial airlines. However, petitioner had no interest in flying as a hobby or as a form of entertainment or sport. In 1961 only one commercial airline had scheduled flights between New York and 440 the Waterville area. The only New York airport that had commercial flight connections with Waterville itself was Kennedy International Airport, which is located at a substantial distance from petitioner's home in New Jersey. There were also some scheduled flights between La Guardia Airport and Augusta, Maine, which is located 20 miles from Waterville. None of these flights were direct; planes had to be changed at either Boston or Portland, Maine. In addition to the time required to travel between petitioner's home and the New York airports and between Augusta and Waterville, flight time between Kennedy Airport and Waterville was approximately 2 1/2 hours, and flight *228 time between La Guardia Airport and Augusta was 2 3/4 to 3 1/4 hours. Petitioner considered chartering a plane, but this idea was ruled out because of limited availability and high cost (approximately $1,200 for a round trip between New York and Maine; and about $50,000 on a yearly charter basis). Petitioner advised Armitage, early in his employment by Keyes, that he wanted Keyes to provide him with private air transportation. Armitage told petitioner, however, that he did not feel the time was ripe to ask Keyes' directors to purchase an airplane; but he assured petitioner that he would, at a proper future time, support such a purchase. During 1961 and 1962 petitioner never formally requested Keyes' executive committee to purchase a corporate airplane. Petitioner decided to purchase a plane himself, and to bear the costs of maintaining and operating it. In the early part of June 1961 petitioner purchased a Douglas A-26 airplane for the sum of $125,000. The A-26 was a converted military plane, which had become popular for executive transportation. It had five passenger seats, cruised at 300 miles per hour, had a range of over 2,000 miles, and flew under the same weather conditions *229 as commercial airlines. The actual flight time of the A-26 between Morristown, New Jersey, where it was hangared, and Waterville was approximately 1 1/4 to 1 1/2 hours. The same type of plane had been owned by Diamond and used by petitioner while he was chief executive of that company. The plane was owned by petitioner until February 1963, when he sold it for $125,000 to Boothe Leasing Co., which thereupon leased the plane to Keyes. Petitioner has continued to use the plane for the same kind of business travel as he did in 1961 and 1962, and Keyes has paid all expenses of maintenance and operation of the plane since early 1963. During 1961 and 1962 petitioner incurred the following expenses for maintenance and operation of the airplane: 1961
1962
Mechanic's salary and payroll taxes
$ 6,894.00
$ 9,150.00
Pilot's fees
8,000.00
16,000.00
Pilot's expenses
1,868.05
3,069.95
Co-Pilot's services
1,355.00
6,002.00
Hangar rental and expense
3,542.40
7,020.00
Supplies
507.89
Gas and oil
5,905.61
22,314.51
Landing fees
39.00
228.90
Repairs and maintenance
1,396.26
6,670.64
Insurance
5,504.80
10,095.00
Miscellaneous
226.32
Total
$35,013.01
$80,777.32
*230 Keyes reimbursed petitioner, and the family corporation for his account, for traveling expenses on commercial airlines and chartered flights of $7,601.14 and $9,136.24 in 1961 and 1962, respectively.However, none of these reimbursements covered any of the transportation costs of trips taken on the personally-owned plane. Petitioner was not reimbursed by Keyes for any of the above expenses of maintaining and operating his private airplane, nor did he seek reimbursement for such expenses. [4] The amount of petitioner's salary was not affected in any way by the fact that he paid the expenses of operating and maintaining his own airplane. A log was maintained showing, with respect to each trip made by petitioner's plane in 1961 and 1962, the following information: The date, origin, destination, points at which landings were made en route, passengers carried on each leg of the trip, and the time of departure and arrival for each leg of the trip. Exhibits summarizing this data, and eategorizing *231 each trip as "business" or "nonbusiness," were admitted into evidence. The figures contained therein for the total hours of operation, and business and nonbusiness hours of operation, differ slightly from those reported on schedules attached to petitioner's income tax returns for 1961 and 1962. The following table summarizes these figures: 441 *10
Hours of Operation
Total
Business
Nonbusiness
TotalExpenses
Hourly Cost
AllocatedCost For * Business
Per return, 1961
80:20
59:30
20:50
$35,013.01
$435.80
$25,930.10
Per exhibits, 1961
79:40
62:20
17:20
35,013.01
439.48
27,392.79
Per return, 1962
283:50
263:15
20:35
80,777.32
284.42
74,873.56
Per exhibits, 1962
285:05
260:25
24:40
80,777.32
283.35
73,789.07 No separate deduction for depreciation was claimed. On the trips claimed to have been made for business purposes, petitioner sometimes was the only passenger; sometimes he was accompanied by Keyes' employees engaged in company business; on occasions, members of his family accompanied him; and on still other occasions the plane was used by Keyes personnel for trips on which *232 petitioner was not a passenger. In petitioner's words, he made the plane "available for use on Keyes business by corporate officers or employees if such use would enhance the efficiency of the function of those officers or employees to the extent that it could be deemed worthwhile." Had transportation other than petitioner's plane been available and practical, petitioner's coemployees would have been reimbursed by Keyes for the expenses of such other transportation; but some of the trips might not have been made, and the business of Keyes consequently might have suffered to that extent, had petitioner not purchased the plane. From June 1961 through December 1962, petitioner made approximately 45 business trips between New York and the Waterville-Portland area. He also frequently traveled on business matters to Boston, where Armitage's firm, Keyes' principal bank, the principal dealers in Keyes securities, and the principal holders of Keyes debentures were located. In addition, petitioner used the plane for business trips to cities such as Halifax, Nova Scotia; Gary, Indiana; Kansas City, Missouri; Philadelphia; Cincinnati; Chicago; and Detroit. Within two or three years from May 1, 1961, the *233 date petitioner's employment by Keyes began, substantial changes in the management and operations of Keyes were effected. Four new directors were elected, the top management positions were staffed by new personnel, and a new office of Vice-President for Marketing Development was added. Domestic sales procedures were updated, new techniques of budget and operations planning and electronic data processing were introduced, and major changes in the foreign operations of Keyes were effected. In the five years after petitioner began his association with Keyes, its net sales increased by 65 percent, its net income rose from $1,830,087 to $3,031,664, and cash dividends on its common stock rose from $973,744 to $1,306,988. During the years 1961 through 1966, the family corporation received the following amounts of dividends and debentures interest from Keyes: Year
Dividends
Interest
Total
1961
$113,362.23
$105,000.00
$218,362.23
1962
115,629.12
105,000.00
220,629.12
1963
147,426.80
105,000.00
252,426.80
1964
125,173.44
23,677.50
148,850.94
1965
120,941.12
120,941.12
1966
145,039.16
145,039.16
During the years 1961 through 1966, petitioner's *234 trust received the following amounts of dividends from the family corporation: Year
Dividends
1961
$163,373.01
1962
215,000.00
1963
175,000.00
1964
90,000.00
1965
100,000.00
1966
125,500.00
During the years 1961 through 1966, petitioner received the following distributions from his trust: Year
Distributions
1961
$156,233.01
1962
193,841.34
1963
102,194.01
1964
81,010.00
1965
100,000.00
1966
125,500.00
Ultimate Findings of Fact Petitioner's employer did not require him to incur the expenses of operating and maintaining a personally owned airplane; nor was the amount of his salary affected by his assumption of such costs. Petitioner would have been reimbursed by his employer had he used commercial or chartered aircraft, 442 rather than his own, for the disputed business travel. He voluntarily assumed the costs of transportation for business trips in 1961 and 1962 on which he used his personally owned airplane. Such costs were nondeductible personal expenses. Opinion The issue presented is whether the expenses of operating and maintaining a private airplane - incurred by petitioner during 1961 and 1962 in connection *235 with the performance of his duties, first as a consultant and then as the chief executive officer of Keyes, a publicly owned corporation - are deductible either as trade or business expenses under section 162(a)[5] or expenses for the production of income under section 212(1), (2), [6] or are nondeductible personal expenses under section 262. [7]
*236 The guiding legal principles determinative of the issue under section 162(a) were stated in Noland v. Commissioner, 269 F. 2d 108 (C.A. 4, 1959) affirming a Memorandum Opinion of this Court, certiorari denied 361 U.S. 885 (1959), as follows (at 111, 113): We start with the assumption that every person who works for compensation is engaged in the business of earning his pay, and that expense which is essential to the continuance of his employment is deductible under § 23(a)(1)(A) of the Internal Revenue Code of 1939 (26 U.S.C.A. § 23). * * * Salary has been treated as business income within the meaning of § 122 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 122. * * * The business of a corporation, however, is not that of its officers, employees or stockholders. Though the individual stockholder-executive, in his own mind, may identify his interest and business with those of the corporation, they legally are distinct, and, ordinarily, if he voluntarily pays or guarantees the corporation's obligations, his expense *237 may not be deducted on his personal return. * * * * * * When the corporation, reimbursing its officers and employees for direct expense incurred in furthering its business, does not reimburse an officer for particular expense, that expense prima facie is personal, either because it was voluntarily assumed or because it did not arise directly out of the exigencies of the business of the corporation. * * * Applying these principles to the present case, petitioner does not qualify for the claimed deductions. Although he was engaged in the business of earning his pay in 1961 and 1962 and is entitled to deduct the ordinary and necessary expenses incurred in such business, he is not entitled to deduct amounts expended in discharging the obligation of Keyes, his employer, to pay his travel expenses. While petitioner conceived of his job to be that of implementing drastic changes in Keyes' policies, and he believed that an airplane was necessary to execute his responsibilities, Keyes' board of directors, not petitioner, had the authority to define his duties; and the board had decided to limit reimbursable transportation expenses to common carrier costs and occasional chartered flights. *238 Indeed, the record shows that petitioner was reimbursed for a substantial amount of such transportation. But he voluntarily assumed the expense of buying, operating, and maintaining his own airplane, which he used for other business transportation, for which he neither claimed nor received any reimbursement whatever. Had he undertaken travel by common carrier or chartered plane and not claimed the reimbursement to which he was entitled, he would not have been entitled to a deduction under section 162(a), for an employee cannot convert an expense of his employer into a deductible expense of his own by voluntarily assuming it. William C. Stolk, 40 T.C. 345, 356 (1963), affd. per curiam 326 F. 2d 760 (C.A. 2, 1964); Coplon v. Commissioner, 277 F. 2d 534 (C.A. 6, 1960), affirming per curiam a 443 Memorandum Opinion of this Court. That petitioner chose to take unreimbursed trips by private airplane instead does not permit a different condlusion, even if it was his judgment that requesting Keyes to pay his private airplane expenses was, at that time, *239 unwise. The record does not show that petitioner incurred the disputed expenses "as a principal rather than as a corporate agent." Heidt v. Commissioner, 274 F. 2d 25, 27 (C.A. 7, 1959), affirming a Menorandum Opinion of this Court. Thus he was neither expected nor required to make the expenditures in order to earn his salary, cf. Schmidlapp v. Commissioner, 96 F. 2d 680 (C.A. 2, 1938); Penn v. Robertson, 29 F. Supp. 386, 387 (M.D.N.C. 1939), affirmed on other issues 115 F. 2d 167 (C.A. 4, 1940); nor did such expenditures have a direct bearing on the amount of his compensation, cf. Harold A. Christensen 17 T.C. 1456 (1952). [8] Although petitioner looked forward to Keyes' eventual adoption of a deferred compensation plan, we find no substantial relationship between petitioner's airplane expenses and such plan; indeed, the evidentiary facts concerning the plan are extremely meager. *240 Considering the record as a whole - petitioner's employment arrangement with Diamond, his substantially lower salary from Keyes, the amount of the airplane expenses in relation to his salary, the absence of any requirement by Keyes' board of directors that he incur the disputed expenses, his failure to claim or even to negotiate for reimbursement to any extent, the absence of any effect of such expenses on the amount of his salary, the substantial amount of personal and family use made of the airplane and other factors - we must conclude that the airplane expenses, being at best the expenses of Keyes voluntarily assumed by petitioner, were nondeductible personal expenses. We are reassured as to the correctness of our conclusion by a conviction that, despite the carefully presented testimony, major considerations inducing the expenditures were the personal convenience of petitioner and a desire to enjoy in his career with Keyes the satisfaction, which he had enjoyed with Diamond, of having an airplane at his disposal. Our conclusion that the expenses were nondeductible personal expenses also disposes of petitioner's alternative argument that the expenses were incurred for the production *241 of income within the meaning of section 212(1). What we said in Walton O. Hewett, 47 T.C. 483, 488 (1967) applies with equal force to petitioner: "The expenditure was not directly or immediately related to the production of petitioner's income. It was more directly related to the production of the corporation's income." Indeed, petitioner was three steps removed from Keyes' income - he was beneficiary of a trust which owned the stock of the family corporation which in turn owned stock in Keyes. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. The corporation was previously called successively, Diamond Match Company, Diamond Gardner Corporation, and Diamond National Corporation.↩
3. A deferred compensation plan was instituted by Keyes after the years involved herein.↩
*. Includes consultant's fee of $20,000 and salary of $16,666.67. ↩
4. The total amounts paid by Keyes during 1961 and 1962 to all of its officers, including petitioner, as reimbursements for business expenses were $24,684.43 and $26,229.79, respectively.↩
*. Hourly cost times business hours.↩
5. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (2) traveling expenses * * * ↩
6. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * * ↩
7. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩
8. The rule is summarized in Mertens, Law of Federal Income Taxation (1966 Revision), Vol. 4A, sec. 25.100, at 376, as follows: Where an employee is entitled to reimbursement from the employer, it is necessary for him to show the extent of such right and to separate expenses which are recoverable from those not recoverable from the employer. In this connection, a distinction must be made between expenses incurred by an employee as a principal rather than as a corporate agent. Examples falling under the "principal" category are those where the employee is expected to make certain expenditures in order to earn his salary, without reimbursement from his employer. Such expenditures would be deductible by the employee and not by the employer. And in cases where the employee is not required by his employer to make the expenditures as a condition to earning his salary and is not reimbursed for making them, such expenditures may be deductible where they have a direct bearing on the amount of his compensation and are made in good faith. A different result is obtained where the employee voluntarily gave up his right of reimbursement and, it was not shown, that his salary was affected by his practice of not claiming reimbursement.↩