Walter E. Bevan and Irene Bevan v. Commissioner.
Bevan v. Commissioner
Docket No. 4588-69.
United States Tax Court
T.C. Memo 1971-312; 1971 Tax Ct. Memo LEXIS 19; 30 T.C.M. (CCH) 1337; T.C.M. (RIA) 71312; December 13, 1971, Filed *19 Reconstruction of income: Understatement: Fraud: False & fraudulent return: Statute of limitations. - 1. Adjustments of gross income and business expense deductions for 1962, 1963, and 1964 are redetermined. 2. The underpayments of tax for 1962, 1963, and 1964 were not "due to fraud." Sec. 6653(b), I.R.C. 1954. 3. Petitioners' income tax return for 1965 was not "false or fraudulent," sec. 6501 (c)(1), I.R.C. 1954; the assessment of a deficiency for that year is barred by the statute of limitations. Thomas E. Hackett, for the petitioners. Clarence E. Barnes, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax under section 6653(b)[1] as follows: Addition
Year
Deficiency
to Tax
1962
$ 368.33
$ 184.17
1963
1,661.73
830.87
1964
10,310.42
5,155.21
1965
2,550.79
1,275.40 The issues for decision are: (1) Whether petitioners understated their gross income 1338 for 1962 through 1965; (2) if petitioners underpaid their income taxes for 1962 through *20 1965, whether any part of the underpayment for each year was due to fraud within the meaning of section 6653(b); (3) whether petitioners filed a false or fraudulent income tax return for 1965 so that the bar of the statute of limitations on assessments is lifted by section 6501(c)(1); and (4) whether petitioners are entitled to business expense deductions in excess of those allowed by respondent. Findings of Fact Walter E. Bevan (hereinafter referred to as Walter) and Irene Bevan (hereinafter Irene), husband and wife, were legal residents of Springfield, Ohio, at the time they filed their petition. They filed joint Federal income tax returns for 1962 through 1965 with the district director of internal revenue, Cincinnati, Ohio. During the years in issue, Walter was a turkey grower; he bought turkey poults, day-old turkeys, from hatcheries and raised them to market weights. He first started this business as a small operation in 1942 when he raised 50 turkeys on his father's farm. His business was interrupted for a short time from 1943, when he entered the military service, until 1944, when he received a disability discharge. When he returned home, Walter discovered that his father *21 was about to lose the farm because of his inability to pay the installments on the purchase price. Walter thereupon agreed to pay the remaining installments, and he subsequently acquired the property from his father. It was on these approximately 18 acres located on the outskirts, and later within the limits, of the City of Springfield, Ohio, that Walter raised turkeys during 1962 through 1965. Prior to 1940, while Walter's father owned the property, he allowed certain individuals to remove gravel from it. These individuals built a small office, 14 feet by 18 feet, on the property. Walter remodeled this building for use as a residence, and he, his wife, and two children moved into the 2-room dwelling during the early 1940's. At that time the house contained no plumbing, and Walter and his family carried water for domestic use from a nearby artesian well. After several years, Walter added two more rooms; in 1955 he had water piped into the building. After these improvements had been made, the house still lacked an indoor toilet, but petitioners continued to live in it until 1969. This house also served as an office for Walter's turkey business. Petitioners have always lived frugally. *22 Walter worked at building his turkey business and from time to time at other, outside jobs, mainly with International Harvester Company. Irene also worked at various jobs away from the turkey farm. Between 1940 and 1960 she worked at Woeber's Pickle, Wittenberg Union House, Buckeye Incubator, Robertson Sign, David's Gloves, Helen's Restaurant, and Hilltop Cafe. Irene saved as much of her "outside" income as possible, and Walter added to her savings money which he earned from jobs away from the farm. These funds were referred to by petitioners as their "life savings." During 1960 and 1961, Walter gave five checks in payment of bills incurred by his son, Walter A. Bevan, in establishing a business involving the raising of chickens. The checks are as follows: Date
Payee
Amount
6-30-60
Bernie Hi-Way Hatcheries
$ 4,100.00
4-3-61
Dekalb Agricultural Assn
600.00
5-25-61
Wickes Lumber Co.
591.22
6-16-61
Harry G. Young
8,151.00
6-20-61
Klager Hatcheries 2,300.00
Total
$ 15,742.22 In addition, on July 1, 1963, Walter gave his son a check in the amount of $ 900. All these payments, including the $ 900 check, were regarded as loans by Walter and his son. The son repaid the advances as money became available to *23 him as follows: Date
Amount
June 1960
$ 1,550.00
Sept. 1961
1,000.00
Oct. 1961
1,000.00
Oct. 1961
1,000.00
Dec. 1961
1,000.00
Apr. 1962
1,000.00
July 1962
1,000.00
Aug. 1962
1,000.00
Sept. 1962
1,000.00
Nov. 1962
1,000.00
Nov. 1963
1,000.00
Dec. 1963
1,500.00
Apr. 1964
500.00
Aug. 1965
500.00
Dec. 1966 1,000.00
Total
$ 15,050.00
Walter did not keep a formal set of books and records on his business records are sketchy and inaccurate. They consist mainly of a series of 3 inch X 5 inch slips of paper, listing the sources and total amounts of his income and expenses. He also has checks which were 1339 used to pay bills and receipts given him upon the payment of numerous expenses. From these records, Walter compiled data which he annually turned over to an accountant for his use in preparing petitioners' joint income tax returns. In auditing petitioners' returns, respondent discovered numerous errors in both the reported income and the claimed deductions. Some of the errors were favorable and others were detrimental to the interests of petitioners. Walter sold a few turkeys at his farm to individual customers. He made most of his sales, however, in large quantities to various dealers. As a general rule, he deposited the *24 funds received from these sales in the Lagonda National Bank, Springfield, Ohio. However, he did not deposit all the receipts. He cashed some of the checks and received currency, and he withheld part of the proceeds of other checks, depositing the remainder. In other instances he endorsed the checks and applied them on various business expenses. The amounts of the items which were not deposited are shown in lines (8) and (9) of Table II set forth below. During 1962 through 1965, Walter made the following bank deposits: TABLE I
Bank
1962
1963
1964
1965
Lagonda Nat. Bank
$ 56,367.43
$ 62,172.15
$ 93,489.52
$ 67,750.81
M & M Fed. S & L Assn
13,000.00
Ft. Lauderdale Nat. Bank
3,740.00
Total
$ 56,367.43
$ 62,172.15
$ 110,229.52
$ 67,750.81
The deposit of $ 13,000 in the M & M Federal Savings and Loan Association, made February 27, 1964, consisted of $ 5,000 derived from current turkey sales and $ 8,000 which petitioners had on hand at the beginning of 1964. The $ 5,000 derived from current turkey sales was part of the $ 6,000 withheld from deposits during 1964 (see line (9), Table II, below). During December 1964, petitioner received turkey proceeds in the amount of $ 3,740 which he deposited in the Fort *25 Lauderdale National Bank on January 7, 1965; $ 3,700 of these funds was withdrawn from that bank and redeposited in the Lagonda National Bank on April 5, 1965. Walter used currency for the payment of certain expenses which he incurred. The items for which these expenditures were made and the amounts thereof are listed in lines (2) through (7) of Table II set forth below. The funds for these cash payments were derived in part from: the currency withheld from deposits of customers' checks; borrowed funds; and repayments of loans. The amounts of these various items available for the cash payments are set forth in lines (9), (12), (13), (14), and (15) of Table II set forth below. Petitioners' joint income tax returns for 1962 and 1963 were assigned to an internal revenue agent for examination on November 2, 1964. That agent, together with a special agent, interviewed Walter on December 17, 1964. The joint returns for 1964 and 1965 were subsequently filed, and another special agent was assigned to petitioners' case in 1967. In computing the deficiencies determined in the notice of deficiencies, petitioners' "gross business income * * * [for each of the four years was] determined by reference *26 to bank deposits and cash payments for both business and nonbusiness purposes." The determinations were as follows: 1340 TABLE II
1962
1963
1964
1965
(1) Bank Deposits
$ 56,367.43
$ 62,172.15
$ 110,229.52
$ 67,750.81
Additions for Cash Expenditures:
(2) Living Expenses
1,040.00
1,040.00
1,040.00
1,040.00
(3) Business Expenses
340.75
1,958.12
31,867.55
1,371.39
(4) Stock Purchase
1,000.00
8,874.13
(5) Automobile Purchase
1,300.00
(6) Interest
435.50
848.63
(7) Loans to John Roush
968.90
Additions for Cash from Customers' Checks:
(8) Checks Applied on Expenses
5,299.59
962.13
45,379.25
(9) Cash Withheld from Deposits
3,200.00
6,000.00
11,702.98
(10) 1965 Check Deposited in 1966
429.49
(11) Total Deposits and other Sources
$ 57,748.18
$ 73,669.86
$ 153,803.60
$ 137,396.68
Reductions:
(12) Borrowed Funds
32,300.00
11,500.00
(13) Loan Repayment (Walter A. Bevan)
1,500.00
500.00
(14) Loan Repayment (John Roush)
2,171.60
(15) Insurance Claim
78.00
(16) Transfer from Savings
3,700.00
(17) Adjusted Gross Receipts
$ 57,748.18
$ 73,591.86
$ 117,832.00
$ 121,696.68
(18) Gross Receipts per Returns 56,421.17
61,799.14
84,885.45
107,526.88
(19) Additional Income
$ 1,327.01
$ 11,792.72
$ 32,946.55
$ 14,169.80 1341 Respondent conceded at the trial that the adjusted *27 gross receipts for 1964 (line (17) of Table II above) were excessive to the extent of $ 5,000. In addition, Walter cashed certain payroll and other checks for customers; these outlays of cash amounted to $ 34 in 1963, $ 50 in 1964, and $ 390 in 1965. Petitioners' deductions were recomputed primarily on the basis of records which Walter maintained. In the notice of deficiencies, respondent made the following total adjustments to the business expense deductions claimed in the returns: 1962
1963
1964
1965
Claimed
$ 2,968.25
$ 52,824.49
$ 56,200.71
$ 57,111.20
Allowed 2,625.55
56,650.17
55,776.29
57,978.00
Decrease or
$ 360.70
[3,825.68)
$ 424.42
$ (866.80)
(Increase) The adjustments for 1962 related to only 5 items whereas the adjustments for the other three years were more extensive. For the four years, respondent made adjustments to 50 items of business expenses; of these adjustments, 29 reduced the amounts of the allowable deductions and 21 increased the amounts of such deductions. In computing their adjusted gross income, petitioners are entitled to deduct business expenses, in addition to the amounts allowed by respondent, as follows: 1962
1963
1964
1965
Interest
$ 87.00
$ 126.70
Taxes
58.67
88.54
68.27
73.07
For *28 1962, 1963, and 1964, petitioners executed Consent Forms 872 extending by agreement the period of limitations upon the assessment of tax. Petitioners concede that the notice of deficiencies for 1962, 1963, and 1964 was issued within the extended period. Respondent concedes that the year 1965 is open for the assessment and collection of a deficiency only under the provisions of section 6501(c)(1), i. e., only if the return for that year was false or fraudulent. Ultimate Findings of Fact 1. Petitioners realized adjusted gross income over and above the amounts reported in their income tax returns for 1962, 1963, and 1964 as follows: 1962
1963
1964
$ 1,327.01
$ 8,760.60
$ 12,896.55
2. Petitioners incurred deductible business expenses for 1962, 1963, and 1964 over and above the amounts allowed by respondent as follows: 1962
1963
1964
$ 145.67
$ 215.24
$ 68.27
3. Petitioners' underpayments of income tax for 1962, 1963, and 1964 were not "due to fraud" within the meaning of section 6653(b). 4. Petitioners' income tax return for 1965 was not "false or fraudulent" within the meaning of section 6501(c)(1). Opinion The parties agree that the records maintained by petitioners are insufficient, standing *29 alone, to permit an accurate computation of petitioners' income tax liability for 1962 through 1965. The evidence clearly shows that Walter made numerous large bank deposits, the sources and nature of which are not recorded in any books of account. He also used the proceeds of turkey sales to pay many of his business expenses without first depositing those proceeds. Respondent was, therefore, entitled to use the bank deposits and cash expenditures method of income reconstruction in redetermining petitioners' gross income. Sec. 446(b); sec. 1.6001-1(a), Income Tax Regs.; Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming in part a Memorandum Opinion of this Court. Under the bank deposits and cash expenditures method of income reconstruction, "Where, as here, the records kept by the taxpayer are manifestly inaccurate and incomplete, the Commissioner may look to other sources of information to establish income, and may take into account, as prima facie evidence of income, bank deposits [and cash expenditures] made by the taxpayer during the years in question." Boyett v. Commissioner, 204 F. 2d 205, 208 (C.A. 5, 1953), affirming a Memorandum Opinion of this Court. Where *30 respondent has employed this method in the determination 1342 of deficiencies, the burden rests with the taxpayer to show that such determination was wrong. See, e. g., Thomas B. Jones, 29 T.C. 601, 613-614 (1957), and cases cited. To sustain the determined additions to tax under section 6653(b), [2] *31 however, the burden of proof rests with respondent. Sec. 7454(a). He must show by clear and convincing evidence that at least a part of the underpayment for each year was "due to fraud." Moreover, to lift the bar of the statute of limitations on the assessment of a deficiency for 1965 under section 6501 (c)(1), [3] respondent must show by similar proof that petitioners filed a "false or fraudulent return with the intent to evade tax" for that year. This means that respondent, in order to carry his burden of proof for each year, must show by clear and convincing evidence that Walter intended to evade a tax believed to be owing. d"> Webb v. Commissioner, 394 F. 2d 366, 377-378 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court; Zelma Court Miller, 51 T.C. 915, 918 (1969). Respondent concedes that he has failed to show that any part of the alleged underpayments was due to fraud on the part of petitioner Irene Bevan. He contends, however, that the evidence shows that Walter attempted to fraudulently conceal current income by (1) failing to maintain or produce records of his turkey sales for any year in issue; (2) by extensively using cash for the payment of business and personal expenses; (3) by depositing a check in *32 1964 in an "out of state" bank; and (4) by depositing in 1964 funds received from current business receipts in a local savings and loan association. None of the evidence relied upon by respondent could be construed as direct proof of fraud. At best it is purely circumstantial. While this is usually the situation in fraud cases, National City Bank of New York, Executor, 35 B.T.A. 975, 988 (1937), affd. 98 F. 2d 93 (C.A. 2, 1938), it means that the probative weight of individual items of evidence must be assessed in the light of all the facts. Among the facts to be considered are the nature and amount of the alleged omissions of income. In considering the amount of the omitted income, however, it must be borne in mind that the bank deposits and cash expenditures method of income reconstruction is, at best, inexact. When viewed as a whole, we think the evidence falls short of showing that Walter deliberately attempted to defraud the Government in filing his income tax returns for any of the years 1962 through 1965. As to the first two items on which respondent relies to establish fraud, we recognize that the failure to maintain sales records and the use of checks received from customers *33 to pay expenses can be used to conceal income and, in given factual situations, may constitute convincing evidence of fraud. However, in the instant case we do not think Walter followed those practices in order to defraud the Government. The picture which emerges from the record as a whole is that of a man who received only a sixth grade education and who worked long hours, enjoying few comforts, while building his turkey farming business to a substantial enterprise. As in the case of many farmers, he maintained only the most meager formal records during the early years of his struggling business, and he failed to institute a formal bookkeeping system after his business had gradually developed to the point where he was making significant amounts of sales. While he was no doubt negligent in failing to keep the kind of records specified in section 6001 and related regulations, we do not think a sinister motive - an intention to defraud the Government - can be inferred from either his mere failure to keep formal records or the use of currency for the payment of his personal and business expenses. 1343 Indeed, for 1962, the gross receipts reported in the joint return ($ 56,421.17) exceeded *34 Walter's bank deposits ($ 56,367.43), and respondent's determination reflects that Walter used currency to pay business expenses of only $ 340.75 out of total allowed expenses in excess of $ 50,000 and to pay personal living expenses of only $ 1,040. While Walter has not shown that respondent's determination for that year was erroneous, we do not think the evidence is sufficient to support a finding of fraud. Similarly for 1963, Walter's reported gross receipts ($ 61,799.14) were only slightly less than his bank deposits ($ 62,172.15). And the business expenses paid with currency ($ 1,958.12) were only a small fraction of the total expenses (about $ 55,000); the personal expenses paid with cash ($ 1,040) were also relatively small. While Walter used certain checks given to him by customers in the total amount of $ 5,299.59 to pay expenses, and he did not deposit $ 3,200 of the proceeds of other checks listed on deposit slips, we do not think this was done with fraudulent intent. Rather it must be viewed in the light of other facts with respect to 1963. First, Walter's slipshod methods of recordkeeping resulted in his claiming as business deduction for 1963 a net amount of $ 3,825.68 *35 less than respondent allowed in the notice of deficiencies. Indeed, an examination of the notice of deficiencies shows that the amounts of 21 individual deduction items for all four years were increased by respondent to amounts in excess of those claimed in the returns as deductions. Respondent argues that "it is not at all uncommon for a taxpayer bent on evading tax to fail to claim all of his legitimate deductions in an attempt to conceal vast amounts of unreported income." We think this argument ascribes far greater accounting sophistication to Walter than he possessed. Rather we think his errors in computing deductions were due to carelessness, and for 1963 they substantially offset the disputed understatement of income. The next point has as great significance for 1964 and 1965 as for 1963, but we discuss it here because it is pertinent to the computation of the 1963 income. For 1963 respondent included in gross receipts a total of $ 3,200 received by Walter in the form of checks which he cashed and did not deposit in his bank account. Respondent also included in gross receipts cash expenditures for business and living expenses in the total amount of $ 2,998.12. Petitioners contend, *36 correctly we believe, that it was unreasonable to treat both these cash receipts and these cash expenditures as gross income.[4] *37 We think it only reasonable that Walter used the cash to pay these expenses. The special agent, in effect, admitted on cross-examination that he could not tell what happened to the cash if not so used. Although respondent's briefs forthrightly face and skillfully deal with every other issue in the case, they never come squarely to grips with this one. In the light of all the evidence, we think the only reasonable inference is that the 1963 turkey sales proceeds not deposited in Walter's bank account were used to pay business expenses and, therefore, inclusion of both the amount of the cashed checks and the amount of the cash expenditures in the gross receipts computation results in a duplication. Cf. United States v. Caserta, 199 F. 2d 905, 907 (C.A. 3, 1952). In sum, we hold that respondent's determination of gross income for 1963 must be adjusted for this duplication and that no part of the underpayment as recomputed with this adjustment was due to fraud. The disputed items for 1964 are more substantial. Respondent determined that Walter understated his income by $ 32,946.55. At the trial, respondent conceded that a $ 5,000 error was made in computing the gross receipts for 1964. This leaves $ 27,946.55 in dispute. While this is a significant amount, the question of whether the omission, if any, was due to fraud must be weighed in the light of the fact that a special agent began his investigation and first interviewed Walter in December 1964, nearly 3 months before the 1964 return was filed. Walter relied upon an accountant to fill out his income tax *38 returns, and we think it incredible that he was not aware of the possible consequences of 1344 deliberately filing a fraudulent return at that point. For this reason alone, we must examine respondent's determinations as to fraud for 1964 and 1965 with great care. The principal item to which the allegedly unreported receipts are attributed is the use of cash to pay farm expenses in the amount of $ 31,867.55; cash was also used to purchase stock, to buy an automobile, and to pay an interest liability in the total amount of $ 2,735.50. Here again, however, respondent, in addition to adding these cash expenditures to gross receipts, included therein the proceeds of checks in the total amount of $ 1,000 (i. e., the difference between the $ 6,000 in line (9), Table II, of our Findings and the $ 5,000 error conceded by respondent). For the reasons discussed above in respect of 1963, we think this resulted in a duplication of gross receipts. Furthermore, during that year, Walter drew a check for $ 6,000 payable to Irene; she cashed it and brought the money home for his use in negotiating for the purchase of some land. The purchase did not materialize, and no adjustment was made for this cash. *39 These two items account for $ 7,000 of the disputed $ 27,946.55, leaving a discrepancy of about $ 21,000. [5]
Walter's principal explanation is that he had cash on hand at the beginning of the year in the amount of $ 13,000 which he deposited in the M & M Federal Savings and Loan Association in February 1964, when he went to Florida and turned his safe over to his son. While we have approached this "cash hoard" testimony with a great deal of skepticism, we are not convinced that the claim is a fabrication. Petitioners have presented a long, credible story, capsuled in our Findings, of a program of saving Irene's earnings from various employments and Walter's wages from International Harvester Company; petitioners referred to these amounts as their "life savings." Early in the investigation, Walter told the special agents that contended that these sales proceeds were deposited amount he then claimed was less than he now contends that he had *40 on hand, we are not prepared to reject his testimony and that of Irene and their son that petitioners' cash accumulation was substantial in amount. Petitioners have shown that their son repaid certain loans, principally during 1961, 1962, and 1963, as detailed in our Findings, thereby making funds available for the accumulation. Indeed, respondent has given credit for some of these repayments in his 1964 and 1965 determinations. Finally, if Walter used cash to pay over $ 34,000 of his 1964 business expenditures, as respondent has determined, we think it incredible that he did not have a substantial amount of cash on hand at any given time, including the beginning of 1964. In our Findings we found this amount to be $ 8,000, relying to a large extent on evidence presented by respondent which tends to show that $ 5,000 of the M & M Federal Savings and Loan deposit was derived from current turkey sales. See Michcel Potson, 22 T.C. 912, 929 (1954). While this leaves part of the 1964 omission from gross income inadequately explained, we do not think the record as a whole convincingly shows that the 1964 return was fraudulent. Two of the other allegedly "fraudulent attempts,"cited by respondent, *41 are pertinent to 1964. First Walter deposited in a Florida bank in early 1965 a $ 3,740 check received from turkey sales in late 1964 (the parties have stipulated that the check was 1964 income). Respondent argues that this deposit in an "out of state bank" is convincing evidence of fraud. While we recognize that the use of an out of state bank may well tend to show a fraudulent intent to conceal income, we do not find that to be true in this case. Walter was visiting in Florida at the time the check was mailed to him and the deposit was made. Within about 3 months, he redeposited this money in his business bank account at the Lagonda National Bank. We think this redeposit is wholly inconsistent with respondent's theory that making the deposit in the Florida bank shows an intent to conceal the money. The other alleged attempt to defraud involved the deposit of currency in the M & M Federal Savings and Loan account, discussed above. Respondent's emphasis is on the fact that this deposit was made in a savings and loan association rather than in the business bank account. We think, however, that Walter's objective was not to defraud the Government by hiding this deposit but rather was *42 to segregate it from his other assets since, at least to some extent, it represented a long-term accumulation of savings. 1345 In sum, for 1964 we hold that the increase in gross income determined by respondent must be reduced by: (1) $ 1,000 for the duplication resulting from treating both the proceeds of cashed checks and cash expenditures as taxable income; (2) $ 6,000 for the check made payable to and cashed by Irene; and (3) $ 8,000 in cash on hand at the beginning of 1964, as well as the conceded error of $ 5,000. We hold further that respondent has not carried his burden of proving that the understatement of income was due to fraud. For 1965, respondent has determined that petitioners had additional income in the amount of $ 14,169.80. Again, we note, the return was filed after the special agent had begun his investigation. Again, we also note, respondent included in gross receipts $ 11,702.98, representing the undeposited proceeds of checks received from customers. He also included in gross receipts cash expenditures covering living expenses, business expenses, stock purchases, and interest in the total amount of $ 12,134.15. In addition to this duplication for which an adjustment *43 is required, respondent determined petitioners understated their business expenses in the net amount of $ 866.80. With these adjustments, the understatement of taxable income for 1965 is very small. We do not think petitioners' return for that year was "false or fraudulent" within the meaning of section 6501(c)(1). The statute of limitations prescribed by section 6501(a), therefore, bars an assessment of a deficiency for 1965. Petitioners have presented the testimony of an accountant to show that Walter had a "cash flow" available from reported income and his cash accumulation sufficient to enable him to make the bank deposits and cover all the cash expenditures referred to in respondent's determination. However, this testimony was merely an analysis of the other evidence presented at the trial. We have carefully considered it, but we do not think it shows that petitioners omitted less income than the amounts reflected in our Findings. We recognize the possibility that the 1962 cash expenditures found to be includible in gross income could have been paid from a prior cash accumulation, but petitioners have not shown that this was the case. Indeed, Walter's testimony is that petitioners' *44 "life savings" were carefully separated from their other funds and not used to pay their everyday expenses. Since petitioners claimed the standard deduction, sections 141-145, the character of their deductions for interest, taxes, and certain other expenses must be resolved. In adjusting the deductions claimed by petitioners, respondent relied upon the records which Walter maintained rather than an analysis of bank withdrawals and cash expenditures. For 1962 and 1963, deductions were claimed for interest in the respective amounts of $ 87 and $ 126.70. The testimony is undisputed that all funds borrowed during 1962 and 1963 were used in Walter's business. Petitioners are therefore entitled to deduct all interest paid during those years as business expenses. J. T. Dorminey, 26 T.C. 940, 947 (1956). However, as to interest deductions of $ 355.50 and $ 390 for 1964 and 1965, respectively, at least some of the funds borrowed during those years were used to purchase stock for purposes of investment. Interest paid on funds used for that purpose does not constitute a business expense and is not deductible in arriving at petitioners' adjusted gross income. Ebb James Ford, Jr., 29 T.C. 499, 505 (1957). *45 Since petitioners failed to produce any evidence showing the amount of interest paid during 1964 and 1965 on funds used for business purposes, no interest is deductible as a business expense during those years. [6]
The gasoline and oil expenses incurred for Walter's farm vehicles and his personal automobile and the cost of utilities used on the farm are deductible only to the extent determined by respondent. While Walter testified that those expenses incurred for his personal use are readily distinguishable from those incurred for the farm, he produced no evidence tending to show either the total amounts he spent for personal use or the amounts spent for the benefit of the farm. On the basis of this record, we cannot find that respondent erred in his determinations. The property taxes present a somewhat different consideration. These taxes are computed as a percentage of the actual value of the property. The total farm property had *46 an appraised value in 1964 of $ 18,980 of which $ 1,680 represented the value of petitioners' residence. Considering that the residence was also used as an 1346 office and that a portion of the land was used for residential purposes, our Findings reflect that 7 1/2 percent of the taxes were attributable to petitioners' residence and that 92 1/2 percent constitute business expenses. Consistent with the conclusions expressed above, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. 3. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. - (1) False Return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
4. Petitioners contend that the cash expenditures (lines (2)-(7), Table II) duplicate both the checks applied on expenses (line (8), Table II) and the cash withheld from deposits (line (9), Table II). However, from the fact that for 1963 and 1965 the checks applied on expenses greatly exceed the total cash expenditures, it is apparent that when respondent identified a customer's check as having been used to pay an expense he did not include that expense among petitioners' cash expenditures. The agent so testified. Consequently, no adjustments to respondent's determinations are required to eliminate any duplication of income between the cash expenditures and the checks applied on expenses.
5. Walter began buying stock in 1964, and his return for that year reflects sales of stock in the amount of $ 12,347.19. However, it is not he had such an accumulation. While the in petitioners' accounts or used to pay any of their business expenses.↩
6. Our conclusion that petitioners' return for 1965 was not "false or fraudulent" within the meaning of sec. 6501(c)(1)↩ is not altered by the fact that they claimed a business expense deduction for interest incurred on funds borrowed for investment purposes.