HAROLD L. KING and ALTA R. KING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
King v. Commissioner
Docket No. 3016-77.
United States Tax Court
T.C. Memo 1979-359; 1979 Tax Ct. Memo LEXIS 159; 39 T.C.M. (CCH) 54; T.C.M. (RIA) 79359; September 10, 1979, Filed E. J. Ball and Kenneth R. Mourton, for the petitioners. Charles N. Woodward, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(b): [1]/ Addition to Tax
Year
Deficiency
(sec. 6653(b))
1967
$11,986.12
$ 5,993.06
1968
8,009.50
4,004.75
1969
17,730.25
8,865.13
1970
28,577.28
14,288.64
1971
41,778.62
20,889.31
The issues for decision are: 1. Whether petitioners, in preparing and filing their 1967 through 1971 joint Federal income tax returns, omitted substantial amounts of income from their farming operations and from petitioner Harold L. King's water well-drilling business. *161 2. Whether the bar of the 3-year statute of limitations otherwise applicable for 1967, 1968, and 1969 was lifted by reason of the application of section 6501(c)(1), relating to false and fraudulent returns, or section 6501(e)(1)(A), relating to the omission of gross income in an amount in excess of 25 percent of the amount of gross income reported. 3. Whether any part of the underpayments for 1967 through 1971 (if such exist) was "due to fraud" within the meaning of section 6653(b) so as to render petitioners liable for additions to tax. FINDINGS OF FACT Petitioners Harold L. King (Harold) and Alta R. King (Alta), husband and wife, were legal residents of Everton, Arkansas, when they filed their petition. They filed joint Federal income tax returns for 1967 through 1971 with the Director, Internal Revenue Service Center, Austin, Texas. During World War II, Harold served in the United States Navy. He was able during the term of his service to save a part of his wages which he routinely sent to his parents in Arkansas. Upon his discharge in 1945, Harold returned home and began living with his parents. Shortly thereafter, Harold and his father purchased, for approximately *162 $1,800, a "cable" well-drilling rig and began contracting to drill water wells. Harold made the downpayment for the rig, approximately $400, out of the money he had saved while in the Navy. In the late 1940's, Harold took over the business. He paid his father for his share of the business with the income he earned while operating the rig. Harold and Alta were maried in 1951. In 1952 they purchased an 80-acre farm which cost them $50 per acre. Shortly thereafter, Harold and his father built a house on this land at a cost of approximately $2,000. At about that same time, Harold transferred approximately 30 acres of the land to his father. As of 1967, the remaining 50 acres and the house, after being remodeled in the 1960's, had a cost basis of $16,000.Petitioners, one of their daughters, Aleta, and their one son, Harold, Jr., lived in the house during the years in issue. Janet, petitioners' oldest daughter, lived in the house until she went away to school in 1970. Janet and Aleta were born in 1952 and 1954, respectively, and Harold, Jr., was born in 1959. Shortly after the birth of each child, petitioners opened a joint savings account in their names and the child's name *163 at the Harrison Federal Savings and Loan Association (hereinafter Harrison Federal), Harrison, Arkansas. (Hereinafter the accounts will be referred to by the child's name.) The initial deposits were in small amounts but petitioners continued to make deposits in the accounts. On March 14, 1961, Harold withdrew $150 from Janet's account and on March 25, 1961, he withdrew $300 from each of the three accounts. In 1969 petitioners transferred $5,000 from each of the accounts to certificates of deposit which were also held jointly by petitioners and the child. The total end-of-year balances and total interest earned on the three accounts for 1966 through 1971 are as follows: Year
End-of-Year Balance
Interest Earned
1966
$ 8,946.34
0
1967
14,226.02
$ 487.48
1968
15,354.53
692.40
1969
736.27
381.74
1970
1,311.13
61.11
1971
2,039.17
83.04
In addition to the accounts described above, Harold had individual bank accounts prior to his marriage to Alta and joint accounts with her during their marriage. Petitioners maintained accounts in several banks. For 1966 through 1971, the total end-of-year balances of the funds held in each bank, excluding the *164 joint accounts discussed above, were as follows: 12/31/66
12/31/67
12/31/68
Checking
Accounts: Security
Bank $ 924.06 $ 138.23 $ (941.54)
1st Nat'l
Bank of
Harrison
409.95
172.34
232.78
Savings
Accounts: Citizens
Bank,
Marshall
3,090.00
10,592.50
12,192.50
Security
Bank
0
0
0
Harrison
Fed. Svgs.
& Loan
40,900.00
49,530.80
63,818.12
Guaranty
Svgs. &
Loan
20,316.71
41,161.30
63,482.28
1st Nat'l
Bank of
Harrison
0
2,200.00
3,900.50
1st Nat'l
Bank, Green
Forest
0
4,128.00
4,128.00
12/31/69
12/31/70
12/31/71
Checking
Accounts: Security
Bank
[2,840.18) $ (312.29) $ (2,382.95)
1st Nat'l
Bank of
Harrison
1,082.14
117.54
216.24
Savings
Accounts: Citizens
Bank,
Marshall
13,592.50
20,718.31
31,385.81
Security
Bank
3,981.50
4,000.00
4,000.00
Harrison
Fed. Svgs.
& Loan
76,933.82
99,011.72
137,044.30
Guaranty
Svgs. &
Loan
95,152.79
108,736.71
137,048.87
1st Nat'l
Bank of
Harrison
4,921.50
7,760.00
7,760.00
1st Nat'l
Bank, Green
Forest
5,578.00
5,578.00
5,578.00
Harold and Alta have lived frugally during their marriage. Alta sewed most *165 of the clothing for herself and her daughters. In addition, the children wore used clothing given to them by relatives. Very little of the family's clothing needed dry cleaning. The daughters did not go to the beauty shop and Alta went only approximately once every 3 months. Harold and Harold, Jr., visited the barber shop infrequently. During the winters of 1967, 1968 and 1969, petitioners heated their home by using a fireplace for which they cut and split firewood from their land. In June 1970, petitioners installed a central heating unit at a cost of $1,299.20. They reverted to the fireplace, however, after using the unit for only one winter. Normally, petitioners gave their children only small gifts and small amounts of money. In 1970, however, petitioners paid for a trip to Europe for their daughters, and in 1970 and 1971 they paid for part of Janet's educational expenses. Petitioners owned only one automobile at any given time. In 1953 and again in 1963 they purchased used Oldsmobiles. The 1963 automobile cost $3,250. In 1971, petitioners purchased a Chevrolet for $4,293.78. The automobiles were used approximately one-half of the time for personal purposes and the *166 remainder of the time for Harold's water well-drilling business and for the farming operation. Petitioners' home telephone was likewise used for business purposes. The family rarely dined outside the home and purchased at the grocery store very few food items for use in their home. Petitioners were able to raise the vegetables they needed on the 50-acre farm. In addition, petitioners occasionally butchered for their personal use one of the cows or calves which they raised. In 1964, petitioners purchased 160 acres of land for $2,000. In 1971 petitioners bought an additional 39 acres for their farming and cattle-raising operation. For this acreage they paid $13,000 in cash. As noted above, petitioners made occasional capital expenditures (i.e., house, house improvement, automobiles) [2]/ for personal purposes. In addition, petitioners made purchases listed below, relating to their farm operations and Harold's water well-drilling business: *167 1952
1953
1958
1960
80 Acres
$4,000.00
0
0
0
"Cable" Drilling
Rig
0
$4,000.00
0
0
Ford Tractor
0
0
$2,464.00
0
Farm Building
0
0
0
$2,000.95
"Rotary" Drilling
Rig
0
0
0
0
GMC 2-Ton Truck
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
Typewriter & Add-
ing Machine
0
0
0
0
160 Acres
0
0
0
0
Dodge 2-Ton
Truck
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
Ford 1/2-Ton
Truck
0
0
0
0
Bush Hog
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
Chev. 2-Ton
Truck
0
0
0
0
Chev. 2-1/2-Ton
Truck
0
0
0
0
Diesel Engine
0
0
0
0
Ford 1/2-Ton
Truck
0
0
0
0
Tractor
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
39 Acres
0
0
0
0
Downpayment &
Equipment
0
0
0
0
Annual Outlay
$4,000.00
$4,000.00
$2,464.00
$2,000.95
1962
1963
1964
1966
80 Acres
0
0
0
0
"Cable" Drilling
Rig
0
0
0
0
Ford Tractor
0
0
0
0
Farm Building
0
0
0
0
"Rotary" Drilling
Rig
$20,000.00
$20,000.00
$20,000.00
0
GMC 2-Ton Truck
0
0
3,900.00
0
Chev. 1/2-Ton
Truck
0
0
2,363.00
0
Typewriter & Add-
ing Machine
0
0
530.29
0
160 Acres
0
0
2,000.00
0
Dodge 2-Ton
Truck
0
0
0
$3,550.00
Chev. 1/2-Ton
Truck
0
0
0
0
Ford 1/2-Ton
Truck
0
0
0
0
Bush Hog
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
Chev. 2-Ton
Truck
0
0
0
0
Chev. 2-1/2-Ton
Truck
0
0
0
0
Chev. 2-1/2-Ton
Truck
0
0
0
0
Diesel Engine
0
0
0
0
Ford 1/2-Ton
Truck
0
0
0
0
Tractor
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
39 Acres
0
0
0
0
Downpayment &
Equipment
0
0
0
0
Annual Outlay
$20,000.00
$20,000.00
$28,793.29
$3,550.00
*168 1967
1969
1970
1971
80 Acres
0
0
0
0
"Cable" Drilling
Rig
0
0
0
0
Ford Tractor
0
0
0
0
Farm Building
0
0
0
0
"Rotary" Drilling
Rig
0
0
0
0
GMC 2-Ton Truck
0
0
0
0
Chev. 1/2-Ton
Truck
0
0
0
0
Typewriter & Add-
ing Machine
0
0
0
0
160 Acres
0
0
0
0
Dodge 2-Ton
Truck
0
0
0
0
Chev. 1/2-Ton
Truck
$1,430.00
0
0
0
Ford 1/2-Ton
Truck
2,431.28
0
0
0
Bush Hog
303.85
0
0
0
Chev. 1/2-Ton
Truck
0
$1,100.00
0
0
Chev. 2-Ton
Truck
0
0
$4,327.00
0
Chev. 2-1/2-Ton
Truck
0
0
6,920.00
0
Diesel Engine
0
0
4,025.50
0
Ford 1/2-Ton
Truck
0
0
3,677.62
0
Tractor
0
0
4,000.00
0
Chev. 1/2-Ton
Truck
0
0
0 1,100.00
39 Acres
0
0
0
13,000.00
Downpayment &
Equipment
0
0
0
4,500.00
Annual Outlay
$4,165.13
$1,100.00
$22,950.12
$18,600.00
The "cable" drilling rig and later the "rotary" drilling rig, shown on the foregoing schedule, enabled Harold to drill annually more water wells and to drill those wells to greater depths than he was able to do with the rig he and his father used during the late 1940's. The "rotary" drilling rig was a sophisticated machine. *169 After its purchase, petitioner was required for the first time to hire helpers. Of all the major asset purchases Harold made through 1971, the "rotary" drilling rig was the only asset he purchased on a deferred payment basis. He paid for the rig over a 3-year period, paying approximately $20,000 a year. On their 1967 through 1971 Federal income tax returns, which Alta prepared, petitioners reported the following amounts of gross income: Water Well
Drilling
Farm
Interest
Total
1967
$98,150.49 $ 145.41
$ 4,412.36
$ 102,708.26
1968
76,245.38
45.80
6,057.81
82,348.99
1969
78,032.24
385.17
9,258.86
87,676.27
1970
91.446.70
765.10
14,254.10
106,465.90
1971
93,492.09
1,237.96
18,120.57
112,850.62 Petitioners did not keep records of their receipts from the water well-drilling business. When she prepared their income tax returns, Alta relied primarily upon bank deposit records to determine the business' gross receipts. The Internal Revenue Service initiated an investigation of petitioners' income tax returns, and, on December 4, 1972, petitioners made the following advance payments to the Internal Revenue Service for application *170 against anticipated additional tax liabilities: Year
Amount of Deposit
1969
$21,000
1970
12,000
1971
23,000
On August 22, 1974, petitioners were indicted under section 7201 on four counts of willfully and knowingly attempting to evade and defeat their income tax for 1968 through 1971. On February 3, 1975, Harold pled guilty to count four of the indictment for willfully and knowingly attempting to evade and defeat his income tax for 1971. A judgment of conviction was entered on that date, and it has become final. The remaining three counts of the indictment relating to 1968, 1969, and 1970, against Harold and all four counts of the indictment against Alta were dismissed. For 1967, 1968, and 1969, petitioners executed Forms 872 (Consent Fixing Period of Limitation Upon Assessment of Income Tax), contingent on the applicability of section 6501(e), extending by agreement the period of limitations upon the assessment of tax to April 15, 1977. In the notice of deficiency dated January 14, 1977, respondent used the net worth increase plus nondeductible expenditures method to reconstruct petitioners' taxable income for 1967 through 1971. The following table *171 is the computation used by respondent in his determination of the deficiencies: 12/31/66
12/31/67
12/31/68
Cash on Hand
The Security Bank $ 924.06 $ 138.23 $ (941.54)
First Nat'l Bank of Harrison
409.95
172.34
232.78
Savings Accounts
Citizens Bank, Marshall
3,090.00
10,592.50
12,192.50
Security Bank
0
0
0
Harrison Federal Savings
Loan
49,846.34
63,756.82
79,172.65
Guaranty Savings & Loan
20,316.71
41,161.30
63,482.28
First Nat'l Bank of Harrison
0
2,200.00
3,900.50
First Nat'l Bank, Green
Forest
0
4,128.00
4,128.00
Book Value - Depreciable
Assets
27,616.52
20,034.60
9,264.75
1973 Oldsmobile
3,250.00
3,250.00
3,250.00
1971 Chevrolet Caprice
0
0
0
Home and 50 Acres
16,000.00
16,000.00
16,000.00
Home Improvement - Central Air
0
0
0
Marion Land - 160 Acres
2,000.00
2,000.00
2,000.00
Land - 39 Acres
0
0
0
Downpayment on Equipment
0
0
0
Total Assets
$123,453.58
$163,433.79
$192,681.92
Liabilities
0
0
0
Net Worth
$123,453.58
$163,433.79
$192,681.92
Prior Year Net Worth
123,453.58
163,433.79
Increase in Net Worth
$ 39,980.21
$ 29,248.13
Adjustments to Net Worth
Personal Expenses
8,594.24
10,457.20
Adjusted Gross Income as
Revised
$ 48,574.45
$ 39,705.33
Adjusted Gross Income
Reported on Return
16,007.84
17,782.10
Omitted Income
$ 32,566.61
$ 21,923.23
*172 12/31/69
12/31/70
12/31/71
Cash on Hand
The Security Bank $ (2,840.18) $ (312.29) $ (2,382.95)
First Nat'l Bank of
Harrison
1,082.14
117.54
216.24
Savings Accounts
Citizens Bank, Marshall
13,592.50
20,718.31
31,385.81
Security Bank
3,981.50
4,000.00
4,000.00
Harrison Federal Savings
& Loan
92,670.09
115,322.85
154,083.47
Guaranty Savings & Loan
95,152.79
108,736.71
137,048.87
First Nat'l Bank of
Harrison
4,921.50
7,760.00
7,760.00
First Nat'l Bank, Green
Forest
5,578.00
5,578.00
5,578.00
Book Value - Depreciable
Assets
1,966.39
19,285.83
14,039.93
1973 Oldsmobile
3,250.00
3,250.00
3,250.00
1971 Chevrolet Caprice
0
0
4,293.78
Home and 50 Acres
16,000.00
16,000.00
16,000.00
Home Improvement - Central
Air
0
1,299.50
1,299.50
Marion Land - 160 Acres
2,000.00
2,000.00
2,000.00
Land - 39 Acres
0
0
13,000.00
Downpayment on Equipment
0
0
4,500.00
Total Assets
$237,354.73
$303,756.45
$396,072.65
Liabilities
0
0
0
Net Worth
$237,354.73
$303,756.45
$396,072.65
Prior Year Net Worth
192,681.92
237,354.73
303,756.45
Increase in Net Worth
$ 44,672.81
$ 66,401.72
$ 92,316.20
Adjustments to Net Worth
Personal Expenses
12,421.18
12,835.01
12,687.73
Adjusted Gross Income as
Revised
$ 57,093.99
$ 79,236.73
$105,003.93
Adjusted Gross Income
Reported on Return
16,391.39
18,615.64
22,564.39
Omitted Income
$ 40,702.60
$ 60,621.09
$ 82,439.54
*173 In addition, respondent determined that petitioners were liable for an addition to tax equal to 50 percent of the underpayment pursuant to section 6653(b). ULTIMATE FINDINGS OF FACT 1. Petitioners' adjusted gross income for 1967 through 1971 was as follows: Adjusted Gross Income
Year
Recomputed
Reported
Unreported
1967
$ 45,716.25
$16,007.84
$ 29,708.41
1968
36,263.37
17,782.10
18,481.27
1969
53,474.17
16,391.39
37,082.78
1970
75,659.10
18,615.64
57,043.46
1971
100,315.03
22,564.39
77,750.64
2. Petitioners' underpayments of income tax for 1967 through 1971 were "due to fraud" within the meaning of section 6653(b) 3. Petitioners' income tax returns for 1967, 1968, and 1969, were "false or fraudulent" within the meaning of section 6501(c)(1). OPINION Issue 1. Omission of Income
Petitioners do not contest the use of the net worth increase plus nondeductible expenditures method in reconstructing their net income but contend that respondent made three errors in applying the method: (1) Failure to allow petitioners credit for having, in addition to their bank accounts, currency on hand at the beginning of each year *174 in issue which they expended during that year to acquire assets listed in the foregoing schedule; (2) inclusion in petitioners' net worth of the three accounts which petitioners jointly held with their children at Harrison Federal; and (3) inclusion of excessive personal expenditures. After careful consideration of all the evidence, we have concluded that respondent erred only with respect to the personal expenditures. A. The Cash Hoard
Petitioners claim they had a cash hoard at the end of each year from 1966 through 1971 in the following amounts: 12/31/66
12/31/67
12/31/68
12/31/69
12/31/70
12/31/71
$135,000
$105,000
$85,000
$65,000
$45,000
$25,000 In explaining how they were able to accumulate as of December 31, 1966, $135,000 in cash, in addition to their other assets, petitioners presented at trial an explanation that they worked hard and lived frugally. Petitioners argue that, while living at home with his parents and prior to his marriage to Alta in 1951, Harold accumulated approximately $35,000. Part of this accumulation came from his savings while in the Navy and the remainder from the water well-drilling business. Petitioners *175 maintain further that, after their marriage, by living frugally, they were able to accumulate approximately $6,500 a year, primarily from Harold's earnings from the water welldrilling business.Harold kept the alleged accumulation, which totaled approximately $150,000 by the end of 1965 and consisted mostly of $50 bills, in glass jars in a place, unknown to Alta, on a bluff located on their homeplace. Petitioners assert that Harold hoarded this money because he was afraid the banks might fail. By the mid-1960's, however, Harold's confidence in financial institutions had been restored. Petitioners contend that, for that reason and because they were concerned they might be robbed and murdered, as nearby neighbors had been, they decided to dispose of the cash hoard. They assert that they accomplished this disposition by placing all receipts from the water well-drilling business and from the farm operations into checking or savings accounts and by spending the hoard, through the years in issue, on the purchase of assets, on the maintenance of equipment, and for living expenses. After careful consideration of the entire record, we have concluded that this cash hoard testimony is *176 not credible. Petitioners' story leaves too many unanswered questions. Harold testified that he hid the hoard in glass jars on his property because he was afraid the banks would fail and that only by the mid-1960's was his concern about their stability alleviated. He was unsure, however, of how many jars he had, of how much money was kept in each jar, and of the total amount of money in the hoard. Alta testified that, although she knew of the hoard, she knew neither its amount nor the location of the hiding place. Such indefiniteness leads us to question Harold's and Alta's credibility. We find it incomprehensible that a successful businessman, such as Harold, would have no definite idea or record of the amount kept in a cash hoard. We think it also unreasonable that, in a family as close in their relationships as this one, Harold would not tell Alta even the location of the hiding place of their hoard of hard-earned money. We are also unconvinced by Harold's explanation that he maintained the alleged cash hoard because he was afraid the banks might fail. If he was indeed concerned about the banks' instability, why then did he, as he testified at trial, have personal bank *177 accounts as early as the late 1940's and why did he as early as 1953 open the first joint savings account at Harrison Federal?Petitioners did not attempt to explain this inconsistency.Also, if, as he claims his concern on this point had been alleviated by the mid-1960's, why did he not at that time deposit the hoard in his and Alta's numerous bank accounts so that he could earn interest on the money? Harold testified that he did not deposit the money because he was afraid, in light of a recent robbery and murder of a neighbor couple who were known to have a cash hoard, that the same might happen to him and Alta once it was learned that they also had a cash hoard. We do not find that explanation convincing. It would seem more likely that the murder of the neighbors would have caused petitioners immediately to deposit their hoard rather than to keep it on their property. Petitioners contend that they did not deposit their cash hoard in their bank accounts but rather used the money to buy assets, to service equipment, and to pay the family's living expenses. Comparison of the alleged annual decreases in the cash hoard with the total amount of the asset purchases, both personal and *178 business, personal expenditures, and repairs in both the water welldrilling business and the farming operation, however, does not show any correlation between the two. Petitioners argue that during 1967 their cash hoard declined $30,000.Yet during that year petitioners purchased assets for a cost of $4,165.13, had personal expenditures, as will be explained below, of $5,736.04, and incurred repair costs of $7,259.63, all of which expenditures total only $17,159.80. The discrepancy for 1968, although smaller, is still significant. The expenditures in that year totaled only $11,770.85 whereas petitioners contend their cash hoard declined by $20,000. The years 1969, 1970, and 1971 present a totally different picture. During those years the total of the asset purchases, repairs and the personal expenditures exceeded the alleged corresponding decreases in the cash hoard. Petitioners did not explain the discrepancies for any of the years in issue. Harold testified at length as to the depths of the wells he drilled and the per foot charge and the cost per foot of those wells. This evidence was intended by petitioners to prove that it would have been impossible for Harold to earn *179 the amounts required to support respondent's determination of omitted income. This testimony, and the argument based upon it, however, is not convincing. The fact is that the net worth increases and cash expenditures occurred, and we find the only explanation advanced to be incredible. B. Joint Bank Accounts
After the birth of each of their three children, petitioners opened joint bank accounts in their names and in the name of the child at Harrison Federal. On March 14, 1961, Harold withdrew $150 from Janet's account and on March 25, 1961, he withdrew $300 from each of the accounts.In 1969, petitioners transferred $5,000 from each of the accounts to certificates of deposit also held in their names and in the name of the child. In addition, during their marriage, petitioners opened personal accounts at Harrison Federal.
For 1966 through 1971, the end-of-year balances in the three joint accounts, including the $15,000 converted to certificates of deposit, and in petitioners' personal accounts at Harrison Federal were as follows: End-of-Year Balances
Year
Joint Accounts
Personal Accounts
Total
1966
$ 8,946.34
$ 40,900.00
$ 49,846.34
1967
14,226.02
49,530.80
63,756.82
1968
15,354.53
63,818.12
79,172.6 5
1969
15,736.27
76,933.82
92,670.09
1970
16,311.13
99,011.72
115,322.85
1971
17,039.17
137,044.30
154,083.47
*180 Total interest earned on the three joint accounts with the children for 1967 through 1971 was as follows: Year
Interest Earned
1967
$487.48
1968
692.40
1969
381.74
1970
61.11
1971
83.04
Petitioners contend that respondent was in error in including the entire balances of the joint accounts in their net worth. Petitioners argue that Harold, by declaring orally that the accounts were for the benefit of the children in order to provide for their education and support should he die, created under Arkansas law a parol trust in personalty for the benefit of the children. On this theory, petitioners argue the interest earned on the joint accounts during 1967 through 1971 was attributable to the children as trust beneficiaries and should be excluded from petitioners' net worth. We disagree. Harold's statement that he was holding the money in the joint accounts in trust for his three children was self-serving, uncorroborated testimony, which can be given little credence. We do not think trusts were created. We think it more likely, in the light of all the facts, that petitioners created and funded the savings accounts, intending that the money, if possible, *181 remain available to finance the children's educations or otherwise to assist the children in getting started in their careers. At the same time, we think the money in the accounts so set aside remained available for petitioners' personal use if they later needed it. This kind of management of family resources is not uncommon and it does not rise to the level of creating a trust. Nonetheless, assuming a parol trust in favor of petitioners' children was created under Arkansas law by Harold's oral statement, see Hawkins v. Scanlon,212 Ark. 180, 206 S.W.2d 179, 183 (1948); Oliver v. Oliver,182 Ark. 1025, 34 S.W.2d 226, 227 (1931), we think the interest earned on the accounts is taxable to petitioners. Petitioners were grantors of the trust and they had access to the accounts and actually withdrew $1,050 from them in March 1961. Because petitioners could use the funds in those accounts for their own purposes, section 674(a) [3]/ requires us to treat petitioners as owners of the trusts, and income earned by the trusts is taxable to them under section 671. [4]/ *182 C. Personal Expenditures
In reconstructing petitioners' taxable income for 1967 through 1971, respondent estimated petitioners' total annual personal expenditures as follows: 1967
1968
1969
1970
1971
$8,594.24
$10,457.20
$12,421.18
$12,835.01
$12,687.73 We think those estimates are excessive. As indicated in the foregoing findings, petitioners' testimony covered their personal expenditures in great detail, and the cross-examination on many items was extensive. That testimony showed that petitioners did not spend a great deal of money but lived simply and frugally. Relying primarily upon the fact that petitioners lived a simple life, as detailed in our Findings of Fact, we find that petitioners' personal expenditures for 1967 through 1971 were as follows: [SEE TABLES IN ORIGINAL] As with most fraud cases, none of the evidence presented is direct proof of fraud. It is our opinion, however, that the whole set of the circumstances, when considered together, adds up to fraud. See National City Bank of New York, Executor v. Commissioner, 35 B.T.A. 975, 988 (1937), affd. 98 F.2d 93 (2d Cir. 1938). Mere *183 unexplained increases in funds held in bank accounts and in asset purchases as we found here are not sufficient standing alone to establish fraud. York v. Commissioner, 24 T.C. 742 (1955). However, where, as here, petitioners have consistently understated their gross income on their tax returns over a period of years, and have given the Court a patently weak explanation, a strong inference of fraud attaches. See, e.g., Boschma v. Commissioner, 374 F.2d 863 (6th Cir. 1967), affg. per curiam a Memorandum Opinion of this Court; Otsuki v. Commissioner, 53 T.C. 96, 108 (1969); Gano v. Commissioner, 19 B.T.A. 518 (1930).
In addition, petitioners failed to keep a record of their receipts from the water well-drilling business whereas they kept records of their expenses. Petitioners used customers' checks, prior to deposit, to purchase assets and pay expenses. This is particularly strong proof of fraud in light of the fact that, when Alta prepared petitioners' income tax returns, she relied upon bank deposit records to determine the amount of gross receipts from the water well-drilling business. Petitioners also had a *184 relatively high degree of business acumen. As an example, petitioners continually transferred their money among various bank accounts so as to earn higher interest, a factor which further weakens their cash hoard theory. Finally, petitioners attempted to explain away their unreported income by use of a cash hoard theory which, for the reasons discussed, was spurious.
Respondent maintains, citing Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964), that the guilty plea which Harold entered on February 3, 1975, of willfully and knowingly attempting to evade and defeat his income tax for 1971 in violation of section 7201, collaterally estopped him from denying that the underpayment of tax for that year was due to his fraud. Petitioners argue that the trial court in accepting Harold's guilty plea failed to follow Rule 11, Federal Rules of Criminal Procedure. For that reason, petitioners contend the plea was so tainted, Worcester v. United States, 370 F.2d 713, 716 (1st Cir. 1966), affg. in part and vacg. in part a Memorandum Opinion of this Court, that this Court should be precluded from applying collateral *185 estoppel against Harold for 1971. We need not decide that issue. In light of all the evidence, we find that at least part of the underpayment of income tax for the years 1967 through 1971 was "due to fraud" on the part of both Harold and Alta.
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. / Listed below are the approximate amounts of the capital expenditures: 1952
1953
1963
1965
House
$2,000
0
0
0
Olds-
mobile
0 $900
0
0
Olds-
mobile
0
0
$3,250
0
Home
Improve-
ments
0
0
0
$5,000
Heating
Unit
0
0
0
0
Chevrolet
0
0
0
0
↩
1966
1970
1971
House
0
0
0
Olds-
mobile
0
0
0
Olds-
mobile
0
0
0
Home
Improve-
ments
$5,000
0
0
Heating
Unit
0
$1,299.20
0
Chevrolet
0
0
$4,293.78
3. / SEC. 674. POWER TO CONTROL BENEFICIAL ENJOYMENT. (a) General Rule.--The grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party. ↩
4. / SEC. 671. TRUST INCOME, DEDUCTIONS, AND CREDITS ATTRIBUTABLE TO GRANTORS AND OTHERS AS SUBSTANTIAL OWNERS. Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. * * *↩